# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 23, 2020    Decided February 19, 2021

No. 19-1190

INTERNATIONAL TRANSMISSION COMPANY, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

AMERICAN MUNICIPAL POWER, INC., ET AL.,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Aaron M. Streett* argued the cause for petitioners. With
him on the briefs were *Jay Ryan* and *J. Mark Little*.

*Carol J. Banta*, Senior Attorney, Federal Energy
Regulatory Commission, argued the cause for respondent.
With her on the brief were *David L. Morenoff*, Acting General
Counsel, and *Robert H. Solomon*, Solicitor. *Lona T. Perry*,
Deputy Solicitor, entered an appearance.

*Gerit F. Hull*, *Daniel R. Simon*, *Omar Bustami*, *Robert A. Weishaar, Jr.*, *Kenneth R. Stark*, *James K. Mitchell*, *Deborah*

*A. Moss*, *Emerson J. Hilton*, *Steven D. Hughey*, Assistant Attorney General, Office of the Attorney General for the State of Michigan, *David E. Pomper*, *Cynthia S. Bogorad*, *Amber L. Martin*, *James H. Holt*, *David Eugene Crawford*, and *Andrea I. Sarmentero Garzon* were on the brief for intervenors American Municipal Power, Inc., et al. in support of respondent. *Spencer A. Sattler*, Assistant Attorney General, Office of the Attorney General for the State of Michigan, entered an appearance.

Before: ROGERS and PILLARD, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Dissenting opinion filed by *Senior Circuit Judge* SENTELLE.

PILLARD, *Circuit Judge*: Three electrical transmission companies, subsidiaries of the same parent company, petition for review of a decision by the Federal Energy Regulatory Commission (FERC) to reduce the enhanced return on equity FERC had previously authorized them to collect from ratepayers due to their status as standalone transmission companies. FERC calls such companies Transcos. Since 2003 it has granted return-on-equity "adders" to Transcos because of what the Commission had concluded was a willingness and ability on their part to invest in transmission infrastructure—a policy objective that Congress endorsed in 2005 when it required FERC to formally establish incentive-based rate treatments for transmission companies. FERC consistently has premised companies' eligibility for "Transco adders" on their standalone transmission status, which it has evaluated by looking to the companies' ability to maintain operational

independence from other participants in the electrical market, such as companies invested in power generation.

In 2016, two foreign-based companies with holdings in U.S. electrical markets acquired the parent company of the three petitioners. A group of transmission customers formally complained to FERC that the petitioners' existing return-on-equity adders were no longer just and reasonable because the companies, post-merger, were no longer independent. FERC found the merger had reduced but not eliminated the three Transcos' independence from other market participants and, based on that finding, reduced the adders at issue by half. Petitioners argue on appeal that, in so doing, FERC arbitrarily departed from a particular methodology for determining independence that they say FERC precedent requires. They claim that, under that methodology, they remained materially independent so the reductions were unjustified. They also argue that FERC exceeded its statutory authority by not expressly finding the existing adders unlawful before setting them at a new level. We conclude that neither claim has merit so deny the petition in full.

## BACKGROUND

### A. Regulatory Context

In 2005, Congress amended the Federal Power Act to require FERC to take action within the year to promulgate a rule to establish "incentive-based . . . rate treatments for the transmission of electric energy," that is, for the bulk movement of electricity across electrical grids. *See* Energy Policy Act of 2005, Pub. L. No. 109-58, § 1241, 119 Stat. 594, 961 (codified as amended at 16 U.S.C. § 824s). Congress's stated purpose was to "benefit[] consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission congestion." 16 U.S.C. § 824s(a). Congestion in the grid arises

when the demand for electricity exceeds the capacity of existing transmission infrastructure. That results in a grid that cannot accommodate consumer demand in certain areas through the transmission of low-cost generation, forcing the grid to instead draw on more expensive generation closer to the areas of high demand, which ultimately raises costs to consumers. Congress legislated in 2005 "against the backdrop of declining investment in transmission infrastructure and increasing electric load"—a combination ripe for transmission congestion. Promoting Transmission Investment Through Pricing Reform, Notice of Proposed Rulemaking, 113 FERC ¶ 61,182 at P1 (2005). It intended the incentive-based rate treatments to help alleviate that problem by encouraging investments in transmission infrastructure, thereby improving the transmission system's capacity and reliability. *See San Diego Gas & Elec. Co. v. FERC*, 913 F.3d 127, 130 (D.C. Cir. 2019).

The implementing rule FERC promulgated the following year established a series of categories of incentive-based rate treatments for public utilities. *See* 18 C.F.R. § 35.35(d). Two of these incentives were limited to standalone transmission companies, meaning companies that deal exclusively in the transmission of electricity, not its generation. *Id.* §§ 35.35(b)(1), (d)(2). Under the incentive at issue in this case, FERC will authorize "[a] return on equity that both encourages Transco formation and is sufficient to attract investment" in transmission facilities and related technologies. *Id.* § 35.35(d)(2)(i); *see* 16 U.S.C. § 824s(b)(2).

The 2006 rule was the first codification of that incentive, but it reflected a preexisting FERC practice of granting independent and standalone transmission companies "adders" to their base return on equity. As its name suggests, a FERC-authorized return on equity determines the extent to which a

utility in the highly regulated electricity sector may earn a profit. FERC ties "adders" to certain behaviors or characteristics of utilities, incentivizing needed actions by bumping up their returns on equity above the base level set by FERC. The first "Transco adders" were granted in 2003 to International Transmission Company and Michigan Electric Transmission Company (METC), two of the petitioners in this case. *ITC Holdings Corp.*, 102 FERC ¶ 61,182 (2003); *METC*, 105 FERC ¶ 61,214 (2003); *see also METC*, 113 FERC ¶ 61,343 (2005).[1] Each adder was worth 100 basis points, an amount equal to a single percentage point.

FERC's stated reason for codifying the Transco adder as one of several available incentives was Transcos' positive track record of investing in transmission infrastructure. It explained that the three Transcos to which it had previously granted such adders, including petitioners International Transmission and METC, had "demonstrated the capability to invest, on a timely basis, significant amounts of capital in transmission projects and in efforts to reduce congestion." Promoting Transmission Investment Through Pricing Reform, Notice of Proposed Rulemaking, 113 FERC ¶ 61182 at P38. FERC concluded that their positive investment record was "related to the stand-alone nature of these entities," explaining that "[b]y eliminating competition for capital between generation and transmission functions and thereby maintaining a singular focus on transmission investment, the Transco model responds more rapidly and precisely to market signals indicating when and where transmission is needed." Promoting Transmission Investment Through Pricing Reform, Order No. 679, 116 FERC ¶ 61,057 at P224 (2006) (Order No. 679). In addition, because Transcos deal only in transmission, they "provide non-

---

[1] International Transmission Company is a subsidiary of ITC Holdings, which owns all three petitioners in this case.

discriminatory access to all grid users." *Id.* Independent Transcos "have no incentive to maintain congestion in order to protect their owned generation"—a situation that might arise, for example, with an integrated utility whose highest-cost generation is brought on line when congestion impedes access to lower-cost power. *Id.* FERC was careful to note that a Transco would be allowed an adder over the long term only if it "continue[d] to provide the benefits which we are trying to incentivize." *Id.* at P226.

Since 2003, FERC has weighed a Transco's ownership and business structure in the course of deciding whether to grant a requested Transco adder. FERC emphasized from the outset that "[i]ndependent ownership and operation of transmission is an important policy objective of the Commission," citing among the benefits of independence the "lessened potential for discrimination, improved access to capital markets for transmission investment, improved asset management, and development of innovative services." *METC*, 105 FERC ¶ 61,214 at P20; *see also ITC Holdings Corp.*, 102 FERC ¶ 61,182 at P68. FERC assessed the Transcos' ability to operate independently from market participants—entities that sell generation or other services that could be affected by a Transco's actions and thus might bear on investment decisions.

In 2003, International Transmission was indirectly owned by a limited partnership, so in assessing International Transmission's independence FERC considered the roles and affiliations of the owner's general and limited partners. *See ITC Holdings Corp.*, 102 FERC ¶ 61,182 at PP39-44. The Commission determined the general partners were of little concern because they lacked financial ties to market participants and that, while the limited partners had interests in generation holdings, they would nonetheless not affect International Transmission's operational independence on

account of their limited voting rights in those other interests. *Id.* When International Transmission went public two years later, FERC continued to permit its adder on the condition that no market participant acquire more than five percent of the company's stock. *See ITC Holdings Corp.*, 111 FERC ¶ 61,149 at PP18-26 (2005).

Soon after that decision, FERC issued a policy statement clarifying its policy on Transco independence. The Commission announced that Transcos with "market participants as passive minority equity owners" were permissible. Policy Statement Regarding Evaluation of Independent Ownership & Operation of Transmission, 111 FERC ¶ 61,473 at PP1-2 (2005). It underscored, however, that it would evaluate rate proposals "to ensure that passive ownership does not affect the independent operation, planning and construction of their transmission system." *Id.*

FERC continued its practice of evaluating Transco independence when it codified the Transco adder in 2006. FERC defined a Transco as simply a standalone transmission company, "regardless of whether it is affiliated with another public utility." Order No. 679, 116 FERC ¶ 61,057 at P201. In so doing, the Commission declined to "exclude affiliated Transcos with active ownership by market participants." *Id.* at P202. But the preamble to FERC's 2006 rule stressed that their independence remained "an important component of the positive contribution of Transcos [to] investment in needed transmission infrastructure," noting specifically that International Transmission and METC were "totally independent of market participants." *Id.* at P240; *see also id.* at P202. FERC thus determined that it would "consider the level of independence of a Transco as part of [its] analysis" in determining "appropriate incentives." *Id.* at P239. It stated that a Transco with active ownership by market participants

could receive the adder "to the extent it can show, for example, why active ownership by an affiliate does not affect the integrity of its investment planning, capital formation, and investment processes or how its business structure provides support for transmission investments in a way similar to the structure of non-affiliated Transcos or Transcos with only passive ownership by market participants." *Id.* at P240.

Since codifying the Transco adder in 2006, FERC has granted it to twelve entities. *See* Electric Transmission Incentives Policy Under Section 219 of the Federal Power Act, Notice of Proposed Rulemaking, 170 FERC ¶ 61,204 at P90 & n.106 (2020). One of the twelve is the third petitioner in this case, ITC Midwest. *See Midcontinent Indep. Sys. Operator, Inc.*, 150 FERC ¶ 61,252 (2015). FERC found ITC Midwest to be "fully independent" but, unlike in earlier cases, granted the Transco a 50—instead of 100—basis point adder. *Id.* at P45. It concluded that its earlier decisions granting 100 basis points were "based on the specific circumstances of the applicants and market conditions at the time of their applications" and determined that 100 basis points was "excessive for the Transco Adder at this time." *Id.* FERC has since recognized 50 basis points to be presumptively the appropriate size for a Transco adder.[2]

---

[2] In a notice of proposed rulemaking published in 2020, FERC proposes eliminating the Transco adder entirely. *See* Electric Transmission Incentives Policy Under Section 219 of the Federal Power Act, Notice of Proposed Rulemaking, 170 FERC ¶ 61,204. It states "that the circumstances have changed significantly since Order No. 679," that "the key reasoning underpinning [FERC's] policy . . . no longer appl[ies]," and that "the Transco business model has not enhanced the deployment of transmission infrastructure sufficiently to justify incentives based on this business model beyond those

## B. Administrative Proceedings

ITC Holdings is the parent company of the three petitioners in this case.[3] All three are members of the Midcontinent Independent System Operator, Inc. (Midcontinent Region), a regional transmission organization. A regional transmission organization is a FERC-approved non-profit, independent organization that administers the grid on a regional basis on behalf of transmission-owning member utilities. The Midcontinent Region operates in the Eastern Interconnection, one of the three major electrical grids in the continental United States. The Midcontinent Region's geographic footprint encompasses Manitoba, Canada, and extends south across fifteen U.S. states, most of which are in the Midwest, with a few in the South.

In 2016, ITC Holdings was acquired by Fortis, Inc., and GIC (Ventures) Private Limited in a merger transaction authorized by FERC. *See Fortis Inc.*, 156 FERC ¶ 61,219 (2016). Fortis is a Canadian holding corporation whose holdings include electric distribution and natural gas utilities in the United States. GIC Ventures is an investment company indirectly owned by the government of Singapore. As a result of the merger transaction, Fortis now owns 80.1 percent of ITC Holdings and GIC Ventures owns the remaining 19.9 percent.

---

incentives available to all public utilities." *Id.* at P90-91. FERC noted that "the Transco business model that the Commission envisioned in approving Transco incentives . . . was one of robust independence," but that, "currently, the majority of Transcos have started out as, or become, transmission affiliates of integrated utilities." *Id.* at P90.

[3] ITC Holdings acquired METC in 2006, after METC had been granted a Transco adder. *See ITC Holdings Corp.*, 116 FERC ¶ 61,271 (2006).

Both Fortis and GIC Ventures have representatives on ITC Holdings' board.

After the merger, a group of ITC Holdings transmission customers—including companies involved in the generation, distribution, and retail sale of electricity and organizations of municipal utilities—filed a complaint with FERC under Section 206 of the Federal Power Act asserting that the three adders held by the petitioners in this case, worth approximately $24 million in annual revenues, were no longer just and reasonable, as required by the Federal Power Act. 16 U.S.C. § 824d(a). As a result of the merger, the three ITC subsidiaries (collectively, ITC) were affiliated with market participants that generate, purchase, and/or sell electricity in the Eastern Interconnection. The complainants argued that petitioners' independence could be affected by ITC's operations, so petitioners were no longer entitled to an incentive reserved for independent Transcos.

The complainants identified two Fortis subsidiaries that generate, purchase, and sell electricity over the Eastern Interconnection grid—one in Ontario, which borders the Midcontinent Region, and the other in New York. And they identified two GIC Ventures subsidiaries that operate in PJM, a regional transmission organization that covers much of the Rust Belt region and that borders the Midcontinent Region in the Midwest. One of those GIC Ventures subsidiaries markets and sells electricity in and around Pittsburgh, and the other owns generation close to the Midcontinent Region, in Illinois, Michigan, and Ohio. Explaining how the affiliates might compromise ITC's independence, the complainants noted that Fortis's subsidiaries operate on an integrated basis, raising the risk, for example, that ITC could make transmission decisions biased in favor of the Ontario and New York companies. They contended that the three Transcos' membership in the

Midcontinent Region, which, like all regional transmission organizations, is itself required to be independent from market participants and collectively oversees the transmission operations of its members, was insufficient to guard against the risks posed by ITC's lack of independence. The consumers argued that the adder's "entire point is the belief that ratepayers gain by placing transmission ownership in an entity that has no reason to even wish to discriminate for or against any subset of transmission users, in part because discrimination can take subtle forms that are difficult to detect and remedy." Complaint at 10 (J.A. 69).

In its answer to the complaint, ITC claimed that the complainants assumed the wrong level of analysis, arguing that participants' status is appropriately assessed at the level of an individual regional transmission system, not across the entire Eastern Interconnection. ITC pointed out that neither GIC nor Fortis has subsidiaries in the Midcontinent Region's markets. It asserted that it accordingly remained independent of the relevant market participants. As support, ITC cited FERC's recent decision in *NextEra Energy Transmission N.Y., Inc.*, 162 FERC ¶ 61,196 (2018), which granted an adder to an Eastern Interconnection Transco even though its parent company owned 38,000 megawatts of generation in different regions within the Interconnection—generation holdings that ITC argued "dwarf[ed] the Fortis and GIC Ventures interests" identified by complainants. Answer at 18 (J.A. 179).

Even if market-participant status were assessed on an Interconnection-wide basis, ITC argued, it maintained sufficient independence under criteria identified in Order No. 679, FERC's preamble to the 2006 rule, because its affiliations did not affect the integrity of its investment planning, capital formation, or investment processes. The ITC companies continued to plan their transmission operations through the

Midcontinent Region, free of influence from Fortis, GIC, or any affiliates; they established capital plans independently before they were used by Fortis management; and they maintained their own financing, funding their programs through debt issuances and equity infusions.

In October 2018, FERC granted the complaint in part, finding that the merger had reduced ITC's independence. It stated that Order No. 679 "established criteria for use in determining whether an entity with active ownership by a market participant is sufficiently independent to qualify for a Transco Adder," including the criteria identified by ITC—an "entity's 'integrity of investment planning, capital formation, and investment processes'"—"'as well as how its business structure provides support for transmission investments.'" *Consumers Energy Co. v. Int'l Transmission Co.*, 165 FERC ¶ 61,021 at P67 (2018) (Complaint Order) (quoting Order No. 679, 116 FERC ¶ 61,057 at PP239-40). FERC drew from Order No. 679 three specific criteria relevant to independence: investment planning, capital formation, and business structure. It assessed ITC's post-merger status under each one.

First, with regard to investment planning, FERC found that ITC "demonstrate[s] some level of independence by developing [its] own capital expansion plans." *Id.* at P69. But it also found that Fortis's evaluation of "capital expenditures on a consolidated basis for its entire corporate family . . . indicate[s] . . . some level of coordination [with] and control" over ITC. *Id.*

Second, with regard to capital formation, FERC again noted that ITC "demonstrate[s] some level of independence in that [it] can issue [its] own debt independently from Fortis and GIC." *Id.* at P70. But Fortis's annual report revealed that "ITC

Holdings can no longer issue its own common stock, and, to some degree, [ITC] rel[ies] on Fortis for financing." *Id.*

Third, with regard to business structure, FERC yet again found that ITC "demonstrate[s] some level of independence" because the majority of ITC Holdings' board of directors "is unaffiliated with Fortis and GIC." *Id.* at P71. But its independence was materially decreased because the representatives of Fortis and GIC on ITC Holdings' Board "provide some oversight," and executives across all of Fortis's utility subsidiaries "meet[] regularly to discuss business operations." *Id.*

In addition to those three criteria, FERC noted "certain minor potential conflicts of interest associated with other assets owned by Fortis and GIC." *Id.* at P72. But it concluded that "such concerns are largely attenuated by the location of such assets and the fact that they are largely subject to small ownership shares by Fortis and GIC." *Id.* It did not respond directly to ITC's suggestion that, under *NextEra*, the location of those interests outside of the regional transmission organization by itself required a finding of continued independence. In the order's recitals, however, FERC did note complainants' efforts to distinguish *NextEra*. *See id.* at P58. Complainants had argued that the ITC Transcos—"incumbent transmission owners of virtually all of the transmission facilities in their respective zones"—are materially different from the Transco in *NextEra*—"a new entrant to the relevant region, with 'no transmission plant in service,' and no established financial history to support external financing." Reply at 13-14 (J.A. 274-75) (quoting *NextEra*, 162 FERC ¶ 61,196 at P22). The *NextEra* Transco "sought a transco incentive for a single project, for which it was the non-incumbent developer selected through a competitive solicitation," whereas the ITC companies were granted adders

"on the basis of their promised full independence from market participants." *Id.* at 14 (J.A. 275).

Considering the independence criteria in combination, FERC concluded that ITC's independence had been materially reduced by the merger. Based on the reduced level of independence, it determined it was "appropriate to revisit the appropriate level" of its Transco adders. Complaint Order, 165 FERC ¶ 61,021 at P73. Citing its decision granting ITC Midwest an adder in 2015, FERC stated that current policy was for "a fully independent transmission company" to receive a 50 basis point adder. *Id.* And "[b]ecause the merger ha[d] reduced, but not eliminated, [ITC's] level of independence," the Commission determined that a 25 basis point adder "appropriately encourages the Transco business model in these circumstances and promotes corresponding consumer benefits." *Id.*

One Commissioner dissented, stating that he would have eliminated the adder entirely because ITC was no longer "sufficiently independent to justify" an adder at any level. *Id.* (Glick, Comm'r, dissenting).

ITC filed a request for rehearing before the Commission. It argued that FERC had failed to identify the applicable legal standard for independence, and had not explained whether the Fortis and GIC subsidiaries that its order suggested present "minor potential conflicts of interest" were properly considered market affiliates. Request for Rehearing at 7 (J.A. 293). It also argued that FERC departed without explanation from its most recent precedent granting Transco adders, *NextEra* and *GridLiance West Transco LLC*, 164 FERC ¶ 61,049 (2018). ITC noted again the *NextEra* Transco's generation holdings in the Eastern Interconnection, and added that the *GridLiance* Transco was controlled by a limited partnership whose

majority partner owned generation throughout the country. *See* Request for Rehearing at 10-11 (J.A. 296-97). ITC claimed that FERC had "offer[ed] no basis for treating [ITC] differently from" those Transcos. *Id.* at 10 (J.A. 296).

FERC denied ITC's request for rehearing in July 2019. *Consumers Energy Co. v. Int'l Transmission Co.*, 168 FERC ¶ 61,035 at PP 16-20 (2019) (Rehearing Order). The Commission first held that it had applied the appropriate independence standard, which it identified as the criteria described in Order No. 679. It disagreed with ITC's suggestion that market affiliates outside the relevant regional transmission organization should not be considered at all, noting that Order No. 679 "places no geographic limitation on the scope of relevant affiliate relationships." *Id.* at P12. And it explained that its conclusion was consistent with *NextEra*, in which FERC deemed the Transco independent despite affiliates "located inside *and outside*" the relevant region. *Id.* at P13 (emphasis in original) (quoting *NextEr*a, 162 FERC ¶ 61,196 at P51).

FERC then affirmed its conclusion that ITC was no longer fully independent after the merger, disagreeing with ITC that *NextEra* and *GridLiance* required a contrary conclusion. FERC noted that it found on the facts of both of those cases that those Transcos' market affiliates "did not 'affect the integrity of [the Transcos'] investment planning, capital formation, and investment processes.'" *Id.* at P17 (quoting *NextEra*, 162 FERC ¶ 61,196 at P51). ITC claimed it was more independent than the Transco in *NextEra*, the Commission noted, but failed to explain "how [it is] more independent." *Id.* at P20. "The Commission evaluates the independence of each Transco on a case-by-case basis based on each proceeding," FERC explained, and "evidence in this record specifically demonstrate[d] that [ITC's] affiliate relationships reduced the

independence of its invest[ment] planning, capital formation, investment processes, and business structure." *Id.*

ITC petitioned us for review.

## DISCUSSION

We uphold FERC's final orders unless they are arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with the law. *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016); *NextEra Energy Res., LLC v. FERC*, 898 F.3d 14, 20 (D.C. Cir. 2018). We review the Commission's factual findings for substantial evidence. 16 U.S.C. § 825*l*(b). "[I]n rate-related matters, the court's review of the Commission's determinations is particularly deferential because such matters are either fairly technical or 'involve policy judgments that lie at the core of the regulatory mission.'" *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 54 (D.C. Cir. 2014) (quoting *Alcoa Inc. v. FERC*, 564 F.3d 1342, 1347 (D.C. Cir. 2009)).

ITC's petition raises two claims. First, it argues that FERC arbitrarily and capriciously departed from precedent establishing a particular methodology to assess Transco independence. Second, it argues that FERC exceeded its statutory authority by reducing ITC's Transco adders without first finding the adders to be unjust and unreasonable. We consider each challenge in turn.

## A. Independence Analysis

FERC expressly declined in Order No. 679 to "establish a specific methodology to factor the level of independence into any request for [return on equity]-based incentives for Transcos," stating that it would instead "evaluate the specific attributes of a particular proposal, including the level of

independence, to determine appropriate incentives." 116 FERC ¶ 61,057 at P239. ITC nonetheless suggests that FERC established just such a methodology in two orders decided before this case: *NextEra* and *GridLiance*. In those cases, FERC granted the Transco adder after finding that the Transco at issue could operate independently of market affiliates inside and outside its transmission region. The analysis was similar in both: FERC noted that affiliates outside the relevant region "[were] distant from . . . and [did] not participate in [the regional system's] markets" and that affiliated holdings inside the region were small and had the sale of their generation output committed under long-term contracts. *GridLiance*, 164 FERC ¶ 61,049 at P43; *accord NextEra*, 162 FERC ¶ 61,196 at P51. From these two cases ITC argues that FERC "established its methodology for applying Order No. 679's general guidance to assess the independence of transmission subsidiaries that are part of corporate families that include some generation holdings." Pet'rs Br. 21. According to ITC, under the *NextEra*/*GridLiance* methodology, FERC first categorizes affiliated holdings based on whether they are inside or outside the transmission region: Those outside have no effect on a Transco's independence because they are geographically distant and outside the regional system's markets, and those inside do not affect a Transco's independence if they are small and their output is committed under long-term contracts. ITC claims FERC "departed without acknowledgment or explanation from its geographically focused methodology" in this case, instead applying "a new corporate-structure test." Pet'rs Br. 22.

ITC's argument that FERC departed from an established methodology fails at the outset because FERC, consistent with its stated intent in Order No. 679, never established any definitive methodology, let alone the one ITC claims it did. FERC has consistently applied a case-by-case approach to

determining Transco independence, considering ownership and business structure as part of that inquiry since it first granted a Transco adder in 2003. When the adder was codified in 2006, Order No. 679 built on prior practice by identifying certain criteria that ITC now mistakenly claims constitute "a new corporate-structure test."

In Order No. 679, FERC extended eligibility for a Transco adder to "[a] transco with active ownership by a market participant . . . to the extent it can show, for example, why active ownership by an affiliate does not affect the integrity of its investment planning, capital formation, and investment processes or how its business structure provides support for transmission investments in a way similar to the structure of non-affiliated Transcos or Transcos with only passive ownership by market participants." Order No. 679, 116 FERC ¶ 61,057 at P240. FERC considered precisely those criteria in its order reducing ITC's adders. It found that ITC was no longer fully independent based on a multi-factored assessment of its investment planning, capital formation, and business structure.

The precedents that ITC argues established a different methodology in fact concluded that the Transcos were independent according to the Order No. 679 criteria. In *NextEra*, FERC held in the same paragraph from which ITC draws its test that, "[b]ased on the record here . . . [the Transco] has demonstrated that its relationship to its affiliated market participants will not affect the integrity of [its] investment planning, capital formation, and investment processes." 162 FERC ¶ 61,196 at P51. FERC then turned to the geographical facts presented on the *NextEra* record to inform that bottom-line finding. *Id.* Its analysis in *GridLiance* was similar. FERC began there by noting it "found [the Transco] ha[d] demonstrated that its relationship to its affiliates will not affect

the integrity of [its] investment planning, capital formation, and investment processes." 164 FERC ¶ 61,049 at P43. Only then did it go on to consider the location and details of the Transco's affiliated holdings. *Id.* Nowhere in either decision did FERC suggest that the geographical factors it weighed in concluding that the Transcos at issue were independent were the only criteria to be considered under Order No. 679. Based on a plain reading of *NextEra* and *GridLiance*, and bolstered by the deference that we owe FERC in the interpretation of its own precedent, *see Mo. Pub. Serv. Comm'n v. FERC*, 783 F.3d 310, 316 (D.C. Cir. 2015), we conclude those decisions do not establish a methodology for assessing independence.

ITC argues that our cases requiring that an agency provide a reasoned explanation when it departs from precedent demand vacatur here. But because FERC adopted no exclusively "geographically focused methodology" from which to depart, FERC had no obligation to explain specifically why its inquiry here was broader. *West Deptford Energy, LLC v. FERC*, 766 F.3d 10 (D.C. Cir. 2014), one of the cases on which ITC relies, illustrates the difference. The issue in *West Deptford* was which tariff governs an "interconnection agreement" between a generator and a regional transmission organization when the organization's tariff is amended in the course of a generator seeking access to the organization's network—the tariff in place when the generator's request is first made, or the tariff in place when the "interconnection agreement" is executed or filed. *Id.* at 12. FERC decided in that case that the earlier tariff governs, despite what "appeared to be an unbroken Commission practice of holding that interconnection agreements filed after the designated effective date of an amended tariff are governed by the amended tariff." *Id.* at 21. We held that the "one-off decision in this case to *deviate*" from settled agency practice was arbitrary. *Id.* FERC claimed a right to employ a case-by-case approach in making the timing

decision, but we dismissed the commission's "paean to administrative flexibility" as unreasoned. *Id.* at 20. ITC argues FERC made the same mistake here, claiming a right to assess Transco independence case-by-case but failing to support its decision to do so with adequate reasoning or explanation.

What ITC overlooks is that the regulatory background and established commission precedent here support a case-by-case approach in a way they did not in *West Deptford*. In *West Deptford*, the practice at issue was uniform, and FERC's claimed adoption of a case-by-case approach arrived in the single decision in which it deviated from that uniform practice. We explained that a case-by-case approach as applied to that issue was in tension with the Federal Power Act's prioritization of predictability and uniformity in tariff terms, and that FERC had entirely failed to "identify[] the relevant factors that would govern a case-by-case analysis." *Id.* at 21. Here, by contrast, FERC expressly adopted a case-by-case approach to transmission incentives generally, and the Transco adder specifically, in Order No. 679. *See* 116 FERC ¶ 61,057 at P43, P239. It explained that a "case-by-case approach ensures that the incentives granted will be tailored to particular circumstances." *Id.* at P43. With regard to the adder, FERC stressed that it would "evaluate the specific attributes of a particular proposal, including the level of independence," in granting any adder. *Id.* at P239. And FERC identified factors relevant to determining independence in the case of a Transco with active market affiliates—the factors applied in the case at hand—even as it declined to identify any particular methodology for weighing them. *Id.* at P240. Unlike in *West Deptford*, then, FERC's multi-factored assessment of ITC's independence was not a departure from established precedent but a continuation of it.

At bottom, ITC's claim is that FERC's case-by-case determinations cannot be reconciled with one another on their facts, and that FERC failed to acknowledge or justify those inconsistencies. ITC argues that, whatever the ultimate finding as to the Order No. 679 criteria in *NextEra* and *GridLiance*, the only facts FERC actually considered in making those findings were the location and nature of the affiliated holdings. And in those analyses, the only market affiliates that FERC concluded could affect independence were those operating in the same regional markets as the Transcos at issue; affiliates or holdings outside those markets were found to have no effect on a Transco's independence. ITC argues that if FERC had limited itself to those same geographical considerations in this case, it would have found ITC to be independent even after the merger, as neither GIC nor Fortis has subsidiaries operating in the Midcontinent Region. Additionally, ITC insists that, even if the Order No. 679 criteria FERC assessed were determinative, ITC has "at least as much independence from a corporate-structure perspective" as did the Transcos at issue in *NextEra* and *GridLiance*. Pet'rs Br. 33-34. Like ITC, those Transcos were reliant on parent companies for financial support, and, unlike ITC, neither was governed by its own board of majority-independent directors, but each was subject to the direction of its parent company's board.

The complainants below, now intervenors on appeal, have offered a possible rejoinder to ITC's claim that the cases cannot be reconciled under a geographical analysis. They note that, while the market affiliates in this case are outside the Midcontinent Region, they are located in bordering areas close enough to be affected by ITC's decisions. Whatever the merit of that argument, ITC's first claim fails for a simpler reason: because, as discussed, FERC has never used a "geographically focused methodology" to determine independence, it was

under no obligation to reconcile the cases under the terms of such a test.

ITC's second claim—that FERC failed to analyze ITC's structural independence relative to *NextEra* and *GridLiance*— is more clearly on point. As context for assessing that claim, it is worth considering the distinct procedural postures in which the cases arrived before FERC. Both *NextEra* and *GridLiance* involved proceedings under Section 205 of the Federal Power Act. *See* 16 U.S.C. § 824d. "Section 205 enables a utility to propose changes in its own rates." *Emera Me. v. FERC*, 854 F.3d 9, 24 (D.C. Cir. 2017). Ratepayers can then challenge filed rates before they go into effect. *See* 16 U.S.C. § 824d(d)-(e). When a utility seeks to increase its rate, it bears the burden of demonstrating that the increase is just and reasonable. *Id.* § 824d(e). Under FERC's 2006 rule implementing transmission incentives, a utility's request for incentive-based rate treatments must be made in a section 205 filing. 18 C.F.R. § 35.35(d).

This case, on the other hand, arose in response to a complaint filed pursuant to Section 206 of the Federal Power Act. *See* 16 U.S.C. § 824e. "Section 206 empowers FERC to modify existing rates upon complaint or on FERC's own initiative." *Emera Me.*, 854 F.3d at 24. Its procedures "are 'entirely different' and 'stricter' than those of section 205." *Id.* (quoting *City of Anaheim v. FERC*, 558 F.3d 521, 525 (D.C. Cir. 2009)). Unlike in a Section 205 proceeding, the proponent of a rate change under Section 206 "bears 'the burden of proving that the existing rate is unlawful.'" *Id.* (quoting *Ala. Power Co. v. FERC*, 993 F.2d 1557, 1571 (D.C. Cir. 1993)).

Against this procedural backdrop, the reason for FERC's assertedly inconsistent analyses comes into sharper relief. Unlike in the case at hand, which arose entirely in response to

a Section 206 complaint that ITC was no longer independent, the issue of independence was not central in *NextEra* or *GridLiance*. The utilities in those cases requested several incentives in their Section 205 filings, only one of which was the Transco adder. *NextEra*, 162 FERC ¶ 61,196 at P1; *GridLiance*, 164 FERC ¶ 61,049 at P1. In both cases, several parties intervened to challenge elements of the Transcos' requests, but in neither did a party challenge the standard for assessing a Transco's independence.

In *GridLiance*, the only challenge raised to granting a Transco adder was based on the adder's interaction with the overall return on equity and other incentives at issue. 164 FERC ¶ 61,049 at PP33-36. No party even questioned the Transco's decisional independence.

In *NextEra*, the closest that any party got to an independence-centered challenge was the claim by an intervenor representing ratepayers that the Transco should not be treated as a standalone entity because it was supported by the financial strength of a parent company. *See* Notice of Intervention and Protest of the N.Y. State Public Service Comm'n at 6-7, *NextEr*a, 162 FERC ¶ 61,196. That intervenor argued that the proposed base return on equity was sufficient to compensate investors for the project's risks, rendering other incentives redundant. At no point did any party challenge or even discuss the criteria by which FERC assesses independence, and FERC's order reflects as much. The Commission merely noted that "a Transco adder under Order No. 679 is not based on the specific risks of an applicant's project, but based upon whether the applicant qualifies under the independence standard for a Transco and 'continues to provide the benefits which we are trying to incentiv[ize].'" 162 FERC ¶ 61,196 at P52 (quoting Order No. 679, 116 FERC ¶ 61,057 at P226).

Here, by contrast, ratepayers came forward with evidence central to their claim that ITC's independence had been reduced by the merger. FERC weighed that evidence against the Order No. 679 criteria and found that ITC's independence had been reduced but not eliminated. In its request for rehearing ITC argued that FERC "offer[ed] no basis for" treating ITC differently from the Transcos in *NextEra* and *GridLiance*, but its only support for that assertion concerned the location of market affiliates, Request for Rehearing at 10-11 (J.A. 296-97), which FERC's initial order made clear was not decisive in this case. As to the Order No. 679 criteria, ITC explained in its request for rehearing why it thought that FERC had gotten the analysis wrong, but it did not compare its decisional independence to that of the Transcos in those earlier cases. It asserted it was more independent than the *NextEra* Transco, but ITC did not even support that conclusory claim with any comparison of the factors that it contends demonstrate its greater independence, as it has sought to do here. For instance, ITC asserted its board was majority-independent without discussing how that compared to the board composition of the other Transcos; it does that for the first time in its petition to this court.

None of this is to suggest ITC bore a burden of demonstrating it was more independent that the Transcos at issue in *NextEra* and *GridLiance*. It is simply to underscore as we consider how its precedents fit together that FERC was not confronted with any "significant showing that analogous cases" under Order No. 679 had "been decided differently." *LeMoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004). Based on the evidence before FERC on rehearing and the case-by-case analysis Order No. 679 requires, it was reasonable for FERC to stand by its initial finding notwithstanding ITC's standalone assertion of greater independence. FERC concluded that, while it "determined that

the integrity of [the *NextEra* Transco's] investment planning, capital formation, and investment processes were unaffected by its affiliate relationships," the "evidence in this record specifically demonstrate[d] that [ITC's] affiliate relationships reduced the independence of its investment planning, capital formation, investment processes, and business structure." Rehearing Order, 168 FERC ¶ 61,035 at P20.

FERC surely could have more extensively investigated investment planning, business structure, and capital formation in *NextEra* and *GridLiance*. It acknowledged as much in a recent decision raising the same issue as the one presented here. *See Kansas Corp. Comm'n v. ITC Great Plains, LLC*, 173 FERC ¶ 61,160 at P8 (2020). FERC's failure to address the Order No. 679 criteria more clearly in earlier cases, however, did not prevent it from considering all relevant evidence brought to its attention in this case.

It is FERC's duty under Section 206 to assess a complaint's allegations that a utility's existing rate is unjust or unreasonable. If FERC finds such allegations to be supported, it is then required to "determine the just and reasonable rate . . . [and] fix the same by order." 16 U.S.C. § 824e. Here, FERC determined that ITC's adders—then set at a level reserved for fully independent Transcos—were no longer appropriate. That finding triggered section 206's requirement that it set a new just and reasonable rate. In view of the deference that we owe FERC in rate-related matters, we cannot conclude that this finding was undermined by other cases in which it faced different claims in procedurally distinct proceedings and reached different results based on distinct records.

## B. Section 206 Finding

ITC also argues that FERC exceeded its statutory authority in the manner that it reduced the adders. Section 206 requires

"FERC to show that an existing rate is unlawful before ordering a new rate." *Emera Me.*, 854 F.3d at 24. ITC argues that FERC violated that mandate by failing to find the existing adders to be unjust or unreasonable before reducing them by half. *See id.* at 21.

ITC's claim fails, however, as FERC's analysis clearly tracked "the two-step procedure mandated by section 206." *Id.* at 22. In response to a complaint that expressly alleged the Transco adders had "been rendered unjust and unreasonable" as a result of the merger, FERC reassessed ITC's independence. Complaint Order, 165 FERC ¶ 61,021 at P1. Finding that the merger had reduced ITC's independence, FERC reasonably concluded that the existing 50 basis point adder—a level reserved for "fully independent" Transcos— was no longer appropriate. Complaint Order, 165 FERC ¶ 61,021 at P73; *see also* Rehearing Order, 168 FERC ¶ 61,035 (Glick, Comm'r, dissenting in part) (concurring in the holding that "the Commission did not err in concluding that the then-existing ROE adder was unjust and unreasonable"). Only then did it proceed to set a new rate. Because the merger had reduced "but not eliminated" ITC's independence, FERC concluded that a 25 basis point adder "appropriately encourages the Transco business model in these circumstances and promotes corresponding consumer benefits." *Id.*

ITC's challenge to that conclusion seems to rest primarily on FERC's failure to use the words "unjust and unreasonable" at the first step. But because FERC granted a complaint that itself explicitly alleged the existing adders were unjust and unreasonable and its analysis tracked the two-step procedure of Section 206, its failure to "use the magic words . . . did not reflect a fatal flaw in its decision." *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 10 (D.C. Cir. 2015); *see also Interstate Nat. Gas Ass'n v. FERC*, 285 F.3d 18, 47 (D.C. Cir.

2002); *R.I. Consumers' Council v. Fed. Power Comm'n*, 504 F.2d 203, 213 n.19 (D.C. Cir. 1974).

This case is not like *Emera Maine*, our precedent on which ITC relies in claiming that FERC's unjust-and-unreasonable finding must be expressed in those exact terms. *See* 854 F.3d at 24. In *Emera Maine*, FERC began by applying a methodology that identified a new just and reasonable rate. Based only on the fact that the newly identified rate was numerically lower than the existing rate, FERC concluded the existing rate was unjust and unreasonable, despite the fact that the existing rate also remained within a broader zone of reasonableness. *Id.* at 26. FERC in *Emera Maine* thus "never actually explained how the existing [rate] was unjust and unreasonable." *Id.* It instead skipped to Section 206's second step and reasoned backward from there, claiming that its analysis "generating a new just and reasonable [rate] necessarily proved that Transmission Owners' existing [rate] was unjust and unreasonable." *Emera Me.*, 854 F.3d at 26; *see also id.* at 18-19 (contending that "both of the burdens of proof under . . . Section 206 can be satisfied using a single [return-on-equity] analysis" (quoting *Coakley v. Bangor Hydro-Elec. Co.*, 150 FERC ¶ 61,165 at P32 (2015))). The opinion under review is markedly different: All but a single paragraph of FERC's analysis here concerned the first-step issue of whether the merger reduced ITC's independence such that an adder level reserved for fully independent Transcos could no longer be considered just and reasonable as applied to ITC.

ITC also claims that, "even if FERC had paid lip service to Section 206's requirements," its analysis could not support its finding that the existing adders were unjust or unreasonable. Pet'rs Br. 42. ITC argues that FERC's analysis "rests on speculation rather than facts and evidence," specifically criticizing FERC's reliance on what ITC calls two

"unremarkable fact[s]": (1) Fortis's consolidated reporting of capital expenditures and (2) regular meetings of executives across Fortis's regulated utilities. *Id.* 42-43. But ITC simply asserts without explanation that FERC was wrong in finding the consolidated planning "indicates some level of coordination and control." Rehearing Order, 168 FERC ¶ 61,035 at P19. ITC also does not challenge FERC's finding that the ITC companies are dependent on Fortis for financing or that Fortis and GIC have members on ITC Holdings' board who can "provide some oversight to ITC Holdings' executives." Complaint Order, 165 FERC ¶ 61,021 at PP70-71. FERC's analysis was thus not "based on sheer speculation," as ITC contends. *City of Centralia v. FERC*, 213 F.3d 742, 749 (D.C. Cir. 2000). There was instead substantial evidence to support FERC's finding that the merger had reduced ITC's independence, thereby rendering the existing adders unjust and unreasonable.

\* \* \*

For the foregoing reasons, we deny the petition for review filed by International Transmission Company, ITC Midwest, LLC, and Michigan Electric Transmission Company, LLC.

*So ordered.*

SENTELLE, *Senior Circuit Judge*, dissenting: Federal agencies are creatures of statute. They have no power to act except as directed by Congress. *See Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001). In the Federal Power Act, Congress directed FERC to set "just and reasonable" rates for electric transmission. 16 U.S.C. §§ 824d(a), 824e. Section 205 applies when a utility company proposes a new rate; the company must show that the proposal is just and reasonable. *See* § 824d(a). Section 206 applies when FERC alters an existing rate, either sua sponte or at a third party's request. *See* § 824e. To alter an existing rate under § 206, FERC must first find that the existing rate is unjust or unreasonable. *See* § 824e(a); *Fed. Power Comm'n v. Sierra Pac. Power*, 350 U.S. 348, 353 (1956) (describing this finding as a "condition precedent" to FERC's § 206 authority).

Here, FERC altered ITC's rate under § 206 without finding the existing rate unjust or unreasonable. Put differently, FERC acted outside its statutory authorization. The majority affirms FERC's action by assuming that because FERC deemed the new rate more "appropriate," it must have considered the old rate unjust or unreasonable. *See ante* at 26; *accord Consumers Energy Co. v. Int'l Transmission Co.*, 165 FERC ¶ 61,021 at P73, 2018 WL 5267539 at *16 (2018). Yet under *SEC v. Chenery Corp.*, we can only affirm for the reasons FERC offered, without assuming alternative conclusions FERC did not provide. *See* 318 U.S. 80, 87-88 (1943). So although I agree that FERC did not arbitrarily or capriciously depart from its precedent, I disagree with the decision to deny ITC's petition for review. I would vacate and remand for FERC to consider whether ITC's original rate was unjust or unreasonable.

In my judgment, this case is governed by *Emera Maine v. FERC*, 854 F.3d 9 (D.C. Cir. 2017). In that case, consumer-side stakeholders filed a complaint under § 206 of the Federal Power Act, alleging that a transmission company's rates had become unjust and unreasonable. In response, FERC reduced the rates to a level it deemed more just and more reasonable without expressly

finding the prior rate unjust or unreasonable. When the transmission company appealed to this Court, FERC argued "that by setting a new just and reasonable [rate], it necessarily found that [the transmission company's] existing [rate] was unjust and unreasonable." 854 F.3d at 15. The *Emera Maine* court rejected FERC's argument, concluding that "[w]ithout a showing that the existing rate is unlawful, FERC has no authority to impose a new rate." *Id.* at 25. Today's decision resurrects what *Emera Maine* laid to rest nearly four years ago.

The majority attempts to distinguish *Emera Maine* because, in that case, FERC "never actually explained how the existing [rate] was unjust and unreasonable," as Congress requires. *Ante* at 27 (alteration in original) (quoting 854 F.3d at 26). Yet the same could be said about FERC's decision here. FERC explains only why the new rate is more "appropriate." *Int'l Transmission Co.*, 165 FERC ¶ 61,021 at P73. Explaining why the new rate is more appropriate does not explain whether the original rate was unjust or unreasonable.

The majority's distinction-without-a-difference gives short shrift to *Emera Maine* and to our other decisions holding that "section 206 mandates a two-step procedure that requires FERC to make an explicit finding that the existing rate is unlawful before setting a new rate." 854 F.3d at 24; *see also Am. Gas Ass'n v. FERC*, 912 F.2d 1496, 1504 (D.C. Cir. 1990) ("[T]he directive to impose a just and reasonable rate . . . is triggered only by the Commission's finding that the existing one is 'unjust[ or] unreasonable . . . .'" (quoting § 824e(a))); *City of Bethany v. FERC*, 727 F.2d 1131, 1143 (D.C. Cir. 1984) ("[U]nder section 206, FERC itself may establish the just and reasonable rate, provided that it first determines that a rate set by a public utility is unjust[ or] unreasonable . . . ."). By retreating from that well-reasoned and workable rule, we invite FERC to further erode congressional limits on its delegated power.

FERC dismisses those congressional limits as "magic words," alluding to Hanna Diyab's *Ali Baba and the Forty Thieves*. Respondent Br. 26, 36. Yet FERC would do well to remember that when Ali Baba's brother forgot the magic words, he could not escape the thieves' cave. Although "unjust" or "unreasonable" are congressional requirements rather than magic words, I would likewise refuse to allow FERC to escape a trap of its own making.

I respectfully dissent.