# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 7, 2022       Decided August 19, 2022

No. 20-1465

LSP TRANSMISSION HOLDINGS II, LLC, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

COALITION OF MISO TRANSMISSION CUSTOMERS, ET AL.,
INTERVENORS

———

Consolidated with 20-1466, 21-1004, 21-1005

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Robert C. Fallon* argued the cause for petitioners. With him on the briefs were *Michael Ray Engleman* and *Christina Switzer*.

*Kenneth R. Stark* and *Robert A. Weishaar, Jr.* were on the brief for intervenors in support of petitioners.

*Susanna Y. Chu*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Matthew R. Christiansen*, General Counsel, *Robert H. Solomon*, Solicitor, and *Matthew J. Glover*, Attorney.

*Kari Valley* argued the cause for non-governmental intervenors in support of respondent. With her on the joint brief were *Ilia Levitine*, *Wendy N. Reed*, *Matthew J. Binette,* and *David S. Berman.*

*William D. Booth*, *Roxane E. Maywalt*, *Paul L. Zimmering*, and *Noel J. Darce* were on the brief for governmental intervenors in support of respondent.

Before: ROGERS, MILLETT and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Opinion dissenting in part and concurring in part filed by *Circuit Judge* ROGERS.

PILLARD, *Circuit Judge*:    LSP Transmission Holdings II, LLC, Cardinal Point Electric, LLC, and LS Power Midcontinent, LLC are transmission development companies. They petition for review of a set of Federal Energy Regulatory Commission (FERC) orders that approve modifications to the criteria used by the Midcontinent Independent System Operator, Inc. (MISO), a regional transmission grid operator, to determine whether opportunities to develop proposed transmission upgrades to the interstate power grid are open to competitive bids from companies like petitioners. Petitioners challenge two aspects of the orders: (1) FERC's decision to accept MISO's proposal to use 230 kilovolts (kV) as the minimum voltage threshold for a project to qualify as a Market Efficiency Project (a category of projects subject to

competitive bidding) rather than requiring a lower 100 kV threshold; and (2) FERC's approval of an exception from competitive bidding for certain reliability projects needed soon. FERC defends its orders on their merits, but it first contests the petitioners' standing to challenge the orders and whether the petitions are ripe for review.

We hold that at least one petitioner—LS Power Midcontinent—has standing to raise these claims, and that the petitions are ripe. But the petitions fail on their merits: FERC's decision to accept 230 kV as the new voltage threshold was not arbitrary and capricious, and FERC reasonably approved MISO's Immediate Need Reliability Exception. We therefore deny the petitions for review.

## BACKGROUND

### I.    Regulatory Background

"The Federal Power Act gives FERC jurisdiction over facilities that transmit electricity in interstate commerce." *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1255 (D.C. Cir. 2018). Under the Act, "electric utilities must charge 'just and reasonable' rates." *Id.* (quoting 16 U.S.C. § 824d(a)). That standard requires applying a concept called the "cost-causation principle," under which "the rates charged for electricity should reflect the costs of providing it." *Id.* In other words, the "burden" on ratepayers of paying for a project should be "matched with [its] benefit" to them, and FERC "may not single out a party" or group of parties "for the full cost of a project, or even most of it, when the benefits of the project are diffuse." *BNP Paribas Energy Trading GP v. FERC*, 743 F.3d 264, 268 (D.C. Cir. 2014).

In 2011, to help ensure just and reasonable rates, FERC promulgated Order No. 1000, which has several features

relevant to this appeal. *See Transmission Plan. & Cost Allocation by Transmission Owning & Operating Pub. Utils.* ("Order No. 1000"), 136 FERC ¶ 61,051, P 1 (2011). First, utilities in each planning region must together produce a regional transmission plan to identify transmission alternatives that resolve the region's needs more efficiently or cost-effectively than would uncoordinated local utility proposals. *Id.* PP 6, 148; *see Old Dominion*, 898 F.3d at 1256. Second, utilities must develop a method for allocating the costs of new transmission facilities selected for cost allocation under the regional plan. 136 FERC ¶ 61,051, PP 9, 558. That formula must abide by the cost-causation principle. *Id.* P 10; *Old Dominion*, 898 F.3d at 1256. Third, Order No. 1000 requires transmission planning regions to adopt a competitive process for determining which companies will develop the projects for which the region's ratepayers will be charged. 136 FERC ¶ 61,051, PP 7, 313, 323-31. Projects whose costs are allocated only locally, in contrast, need not be competitively bid. *See Transmission Plan. & Cost Allocation by Transmission Owning & Operating Pub. Utils.* ("Order No. 1000-A"), 139 FERC ¶ 61,132, P 430 (2012); *see also MISO Transmission Owners v. FERC*, 819 F.3d 329, 335 (7th Cir. 2016).

## II. Factual and Procedural History

A.  MISO "is a regional transmission organization and an independent system operator authorized by" FERC "to administer an open access transmission tariff" and "ensure reliable operation of" high-voltage power lines in the Midcontinent region, encompassing fifteen states and a Canadian province. Joint Br. of Non-Governmental Intervenors for Respondent at iv. Pursuant to Order No. 1000, MISO engages in an annual regional transmission planning process in which it identifies transmission projects that address reliability and economic needs. That process culminates in the

creation of a regional transmission plan. *See* Order No. 1000, 136 FERC ¶ 61,051, P 47.

As part of that process, MISO categorizes its future transmission projects, and those categorizations dictate features of the project relevant to this appeal, including: (1) whether the project will be assigned to the incumbent transmission provider or be subject to competitive bidding by developers; and (2) whether the costs of the project will be allocated to ratepayers across the entire region or only to those in the local zone in which the project is located.

This case concerns three categories of projects. The first category is Market Efficiency Projects, which is one of two MISO categories subject to competitive developer selection and regional cost allocation. (The other competitively bid category, Multi-Value Projects, is not at issue here.) In other words, projects in this category must be assigned to a developer through a competitive bidding process, and the costs of such projects are shared according to a formula throughout the MISO region. The purpose of the Market Efficiency category is to facilitate the development of "projects that, through congestion relief, provide[] widespread economic benefits." Prepared Direct Test. of Jesse Moser on Behalf of the Midcontinent Independent System Operator, Inc. ("Moser Testimony") at 30, Joint Appendix (J.A.) 312. Before the challenged orders, to qualify as a Market Efficiency Project, a project had to meet a certain regional benefit-to-cost ratio, cost at least $5 million, and devote fifty percent or more of the project costs to facilities with voltages of at least 345 kV.

The second relevant category of projects is Baseline Reliability Projects. These are network upgrades needed to ensure compliance with applicable national and regional reliability standards. "[E]nsuring the reliability of the electric

grid is a primary function of" transmission organizations like MISO. *Delaware Div. of Pub. Advoc. v. FERC*, 3 F.4th 461, 467 (D.C. Cir. 2021). MISO therefore performs Baseline Reliability Studies to evaluate its compliance with various reliability standards and identify necessary upgrades. Baseline Reliability Projects are not eligible for competitive bidding and the costs of such projects are allocated locally—that is, within the transmission pricing zone where the project is located.[1] If a Baseline Reliability Project also meets the criteria of a Market Efficiency Project, however, it is considered one and is subject to competitive bidding and regional cost allocation (with an exception discussed below for projects needed within a certain timeframe). In this way, MISO's tariff establishes a "hierarchy" of project categories. Moser Testimony at 33-34, J.A. 315-16.

Third, projects that do not fall into any other category are "Other Projects." Those projects are not subject to competitive bidding or regional cost allocation, meaning that all of their costs are allocated to the local zone where the project will be physically located. The Other Projects category includes projects designed to serve economic needs that do not meet the voltage threshold of a Market Efficiency Project.

B. MISO coordinates with various stakeholders— including utilities, municipalities, customers, state utilities commissions, and others—to develop the regional transmission plan. In 2015, MISO began a stakeholder consultation process to develop revisions to its tariff. Starting in February 2019, MISO submitted to FERC a series of proposals that emerged from that process. FERC rejected MISO's first two proposals.

---

[1] The cost allocation regime for MISO's Baseline Reliability Projects is at issue in a related petition we heard the same day as this one. *See Coalition of MISO Transmission Customers, et al. v. FERC*, No. 20-1421.

It rejected the first proposal because of concerns regarding MISO's proposed new Local Economic Project category for certain economic projects operating below 230 kV. *Midcontinent Indep. Sys. Operator, Inc. Order Rejecting Proposed Tariff Revisions* ("*2019 Proposal Rejection*"), 167 FERC ¶ 61,258, PP 1, 9 (2019). That category would have included projects that met both a regional benefit-to-cost ratio and a local benefit-to-cost ratio, but the costs of those projects would have been allocated only locally. *Id.* PP 58, 63. The Commission disapproved as contrary to the cost-causation principle MISO's plan to "identify regional benefits for Local Economic Projects, but, for the purpose of imposing its preferred cost allocation method, . . . ignore the results of its regional benefit metrics analysis in order to allocate the costs only to the Transmission Pricing Zone(s) where the project is located." *Id.* P 63.

MISO tried a second time. Again, FERC rejected the proposed cost allocation method for the Local Economic Project category. This time, MISO did not require a regional benefit-to-cost ratio for Local Economic Projects. *Midcontinent Indep. Sys. Operator, Inc. Order Rejecting Proposed Tariff Revisions* ("*2020 Proposal Rejection*"), 170 FERC ¶ 61,241, P 60 (2020). MISO would, however, employ a benefits metric that called for determining benefits outside the local pricing zone where the project is located, "but then disregard[] these benefits by allocating costs for the project solely within that Transmission Pricing Zone." *Id.* P 59. FERC deemed that method, too, in violation of the cost-causation principle. *Id.*

In April 2020, MISO submitted a third proposal, which is at issue here. This one omits the previously proposed Local Economic Project category that FERC had deemed problematic. And it reflects a variety of other changes,

including two that petitioners challenge here. First, MISO proposed to lower the minimum voltage threshold for Market Efficiency Projects from 345 kV to 230 kV. MISO explained that this change would expand the universe of projects open to competitive bidding and regional cost allocation while still maintaining a distinction between regional projects and those that primarily benefit one local zone.

MISO also proposed a new Immediate Need Reliability Project category that would be exempt from competitive solicitation. That category would encompass projects that (1) meet the requirements of both Baseline Reliability Projects *and* Market Efficiency Projects; and (2) are scheduled for completion within three years to resolve a pressing reliability need. MISO anticipated that those conditions would occur infrequently, resulting in about one exempted project per planning cycle. As MISO explained, it was expanding the Market Efficiency Project category to include lower voltage projects, which, because of the tariff's hierarchy, would likely increase the number of potential Baseline Reliability Projects that also qualify as Market Efficiency Projects open to developer competition. But because running a competitive selection process can take more than a year, MISO reasoned, competing a project can postpone its construction and completion. Where projects are forecast to be required for grid reliability, added time that pushes their completion past the projected need-by date can be particularly problematic. MISO accordingly defended this new exception as necessary to ensure that its expansion of the competitive development process did not threaten system reliability.

In the first of four orders at issue here, FERC approved the proposed changes, including the two that petitioners challenge. To start, it found MISO's proposal to lower the Market Efficiency Project minimum voltage threshold from 345 kV to

230 kV to be just and reasonable. And, in so holding, FERC rejected the petitioners' request that the threshold be lowered even further to 100 kV. It distinguished our decision in *Old Dominion*, in which we held that "a categorical refusal to permit any regional cost sharing for an important category of projects conceded to produce significant regional benefits" was inconsistent with the cost-causation principle. 898 F.3d at 1263. "Unlike the situation in" *Old Dominion*, FERC reasoned, "neither MISO nor the Commission . . . has made the finding that MISO projects between 100 kV and 230 kV produce 'significant regional benefits.'" *Midcontinent Indep. Sys. Operator, Inc. Order Accepting Proposed Tariff and Transmission Owners Agreement Revisions* ("*Order Accepting Proposal*"), 172 FERC ¶ 61,095, P 49 (2020) (quoting *Old Dominion*, 898 F.3d at 1257, 1261). Moreover, the proposal "will increase the universe of projects eligible to be considered a Market Efficiency Project," and thus "will also expand the number of potential transmission projects that are eligible for" competitive selection. *Id.* P 50. FERC therefore permitted the proposed change to the threshold.

FERC also approved MISO's proposal to except Immediate Need Reliability Projects from developer competition. The Commission cautioned that the exception "should be used only in limited circumstances." *Order Accepting Proposal*, 172 FERC ¶ 61,095, P 61. In deciding whether to approve similar proposals from other regional transmission operators, FERC had used "five criteria, which place reasonable bounds on discretion to determine whether there is sufficient time to permit competition to develop reliability projects." *Id.* FERC noted that MISO's proposal limited its resort to the Immediate Need Reliability category by adopting "the same five criteria that the Commission previously accepted for use in other" regions. *Id.* P 62. FERC therefore approved the proposal. *Id.*

Petitioners sought and FERC denied rehearing. *See Midcontinent Indep. Sys. Operator, Inc. Order Addressing Arguments Raised on Rehearing* ("*Proposal Rehearing Order*"), 173 FERC ¶ 61,203, P 2 (2020). Petitioners argued that FERC had previously determined that sub-230 kV projects have significant regional benefits when it found a then-existing 345 kV threshold for certain *interregional* projects unreasonable and required MISO to lower it to 100 kV. FERC distinguished that decision by relying on the differences between interregional and regional projects, noting that interregional projects raise a special problem: They must meet both MISO's threshold and the other independent system operator's threshold. It was in that specific circumstance that FERC held MISO's high voltage threshold held up the consideration of beneficial interregional projects. FERC also rejected the petitioners' other arguments for a lower threshold, including that FERC had ignored evidence that sub-230 kV projects have significant regional benefits and that FERC's rejections of MISO's two prior proposals mandated rejection of this one.

Regarding the Immediate Need Reliability Exception, FERC rejected the petitioners' arguments that the new category would be overused and that FERC had failed to follow its own precedent. It further explained that FERC's five criteria for when a project may qualify for a reliability category do not require MISO to post a description of the reliability need before (rather than after) designating the incumbent transmission owner as the developer of the project. That is so, FERC observed, because MISO will have opportunities to invite stakeholder input during the Baseline Reliability Study and transmission planning, as well as during a sixty-day comment period after it publishes the notice that the project is approved. *Proposal Rehearing Order*, 173 FERC ¶ 61,203, P 23.

C. Separately, in June 2019, the petitioners filed a complaint against MISO under section 206 of the Federal Power Act, 16 U.S.C. § 824e, alleging that the then-existing transmission planning process had resulted in unjust and unreasonable rates. They asked FERC to require MISO to lower the Market Efficiency Project voltage threshold from the old 345 kV limit down to 100 kV. They claimed that projects between 345 kV and 100 kV can have regional benefits and, citing MISO's 2016 Working Group meeting, argued that lowering the threshold to 230 kV was inadequate in view of four hypothetical examples MISO had presented of sub-230 kV projects with benefits in more than one pricing zone. The petitioners also cited examples from the 2017 Working Group meeting, as well as projects from MISO's 2018 transmission plan that produced more regional than local benefits. The petitioners argued that the 345 kV threshold violated the cost-causation principle because the resulting cost allocation did not charge all beneficiaries of the projects.

In the third order on review here, issued the same day as the order accepting MISO's proposed tariff revisions, FERC denied the petitioners' section 206 complaint. Recognizing that it had just accepted MISO's proposed 230 kV threshold in the concurrent order, the Commission concluded that the petitioners had failed to show that the previously-existing 345 kV threshold was unjust and unreasonable. FERC characterized much of the petitioners' evidence that 230 kV projects produce regional benefits as hypothetical or isolated and therefore insufficient to meet their burden of demonstrating that MISO's threshold was unjust and unreasonable. It also rejected the petitioners' argument that FERC's rejection of the first two MISO proposals mandated rejecting this proposal. Unlike the first two rejections, it explained, in the third proposal "MISO does not, and has not, proposed to analyze the extent and distribution of benefits of a project and then ignore

that analysis for the purpose of cost allocation." *LSP Transmission Holdings II, LLC et al. v. Midcontinent Independent System Operator, Inc. Order Denying Complaint* ("*Complaint Rejection Order*"), 172 FERC ¶ 61,098, P 47 (2020). It therefore denied the complaint.

The petitioners also sought rehearing of the order rejecting their complaint, arguing that they had put forward substantial evidence that a threshold over 100 kV for Market Efficiency Projects would inappropriately exclude regionally beneficial projects. FERC denied the rehearing request in the fourth order challenged here. *LSP Transmission Holdings II, LLC, et al. v. Midcontinent Independent System Operator, Inc. Order Addressing Arguments Raised on Rehearing* ("*Complaint Rehearing Order*"), 173 FERC ¶ 61,202, P 2 (2020). FERC explained that it addressed most of the petitioners' arguments on rehearing in the underlying complaint order and reaffirmed its holding that the petitioners had failed to demonstrate that the Market Efficiency Project threshold was unjust and unreasonable.

D. The petitioners timely sought review of all four FERC orders. The petitions garnered four case numbers, which correspond as follows: The orders on review in Nos. 20-1466 and 21-1005 arise from FERC's decision to accept MISO's tariff revisions under section 205 of the Federal Power Act, 16 U.S.C. § 824d, while the orders on review in Nos. 20-1465 and 21-1004 arise from the petitioners' complaint to FERC under section 206 of the Act. We consolidated the petitions. After oral argument in this case, we directed the petitioners to file supplemental briefs in defense of their position that they have Article III standing.

## JURISDICTION

These petitions are properly before us pursuant to section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b). FERC disputes, however, whether the petitioners have standing and whether their petitions are ripe for review. The answer to both questions is yes.

### I. Petitioner LS Power Midcontinent has sufficiently demonstrated its standing.

We first hold that at least one petitioner—LS Power Midcontinent, LLC—has standing. This conclusion follows almost directly from our decision earlier this year in *LSP Transmission Holdings II, LLC v. FERC* (*LSP 2022*), 28 F.4th 1285, 1287-89 (D.C. Cir. 2022). There, we held that LSP Transmission Holdings had standing to challenge ISO New England's immediate-need reliability exception. *Id.* at 1288-89. In 2013, FERC had permitted ISO New England to exempt from competition reliability projects needed within three years. *Id.* at 1287-88. By 2019, FERC was concerned that ISO New England might not be following Order No. 1000's competitive selection requirements, and it directed the ISO to explain how it was complying with the immediate-need reliability project criteria. *Id.* at 1288. LSP intervened, arguing that ISO New England was overusing the exemption, but FERC eventually disagreed and found no error. *Id.* LSP petitioned our court for review, and FERC challenged its standing.

We held that "to establish injury, LSP had only to show that it 'was ready, willing and able to perform' and that Order No. 1000 and the tariff 'deprived the company of the opportunity to compete' for the work." *LSP 2022*, 28 F.4th at 1288-89 (quoting *O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 423 (D.C. Cir. 1992)). And we held that "LSP met these requirements" because "[i]t demonstrated

its readiness when its subsidiary bid on the only one of thirty-one recent reliability projects open to competitive bidding." *Id.* at 1289. "Yet because of the Commission's criteria, there was no competitive bidding for the thirty other transmission projects," and "LSP accordingly ha[d] suffered an Article III injury." *Id.*

We distinguished our unpublished decision in *LSP Transmission Holdings, LLC v. FERC* (*LSP 2017*), 700 F. App'x 1 (D.C. Cir. 2017) (per curiam). In *LSP 2017*, we had "held that LSP lacked standing to claim that a utility wrongfully excluded it 'from competition based on state and local laws'" because "LSP failed to identify a 'specific project that [the utility] ha[d] approved for regional cost allocation in a state whose law gives an incumbent a right of first refusal.'" *LSP 2022*, 28 F.4th at 1289 (quoting *LSP 2017*, 700 F. App'x at 2) (first alteration in original). There, it was not at all clear that any project even existed that was located in a state with rights of first refusal and thereby foreclosed from competition. Given that uncertainty, identifying a specific project was essential to demonstrating injury in fact. Unlike in *LSP 2017*, we explained, in *LSP 2022* there could "be no doubting [LS Power's] assertion that it ha[d] been denied the ability to bid on the thirty identified projects as a result of" the exemption. *Id.*

The same is true here. LS Power Midcontinent has standing in this case under *LSP 2022* because it has demonstrated that it is ready, willing, and able to perform the type of work at issue and that the challenged orders prevented it from doing so. First, LS Power Midcontinent is pre-certified as a transmission developer under MISO's criteria for the region, and an LS Power affiliate was the winning developer in one of only two Market Efficiency Project solicitations. Petitioners' Br. at xi, 32; *see LSP* 2022, 28 F.4th at 1288.

Indeed, FERC conceded at oral argument that the petitioners are certified transmission developers qualified to compete for this type of construction work. Oral Arg. Tr. at 33-34.

Second, the challenged orders have prohibited LS Power from competing for that work. *See LSP 2022*, 28 F.4th at 1288-89. For example, as evidence of its injury from the higher voltage threshold, LS Power points to MISO's 2018 transmission plan, which included two 161 kV projects that LS Power contends were regionally beneficial and therefore should have been regionally cost-allocated so competitively bid. *See* Reply Br. at 5. And regarding LS Power's injury from the new exception for immediate need projects, MISO itself acknowledged that the exception to competition "would impact approximately one Baseline Reliability Project per MTEP cycle." Moser Testimony at 38, J.A. 320. That suffices to demonstrate that LS Power has been "deprived . . . of the opportunity to compete for . . . work." *LSP 2022*, 28 F.4th at 1289 (internal quotation marks and citation omitted).

To prove its injury, LS Power need not identify a specific project within the class of projects that, "[t]here can be no doubting[,]" *id.*, are excluded from competition. No one disputes that the identified class in fact includes relevant projects. This case is therefore distinguishable from our unpublished *LSP 2017* decision for the same reason *LSP 2022* was: There is no doubt here that LS Power is completely barred from competing for entire categories of projects for which it would otherwise compete. *See LSP 2022*, 28 F.4th at 1289 (citing *LSP 2017*, 700 F. App'x at 2). LS Power therefore has standing to challenge those categorizations.[2]

---

[2] The separate opinion's concerns are well taken as we all agree "that a bare assertion that a petitioner is 'ready, willing, and able' to compete is [not] sufficient to establish Article III injury-in-fact."

16

We also reject FERC's argument that the petitioners lack standing because the Commission's orders effected a net increase in the number of projects eligible for competitive bidding by lowering the threshold from 345 kV to 230 kV. That FERC gave the petitioners a half-measure of what they requested does not negate their injury from the continued bar on competition for sub-230 kV projects.   LS Power Midcontinent therefore has standing to raise its challenges to the four FERC orders.[3]

---

Separate Op. at 3; *see also id.* at 5.  Instead, a petitioner must also show that agency action has "deprived [it] of the opportunity to compete for the work."  *LSP 2022*, 28 F.4th at 1289 (internal quotation marks and citation omitted).  And it must substantiate its standing by pointing to record evidence or submitting new evidence. *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002).  LS Power has done just that by showing both that it has competed for the rare project open to it, and that the challenged rule now categorically excludes it from competing for all Market Efficiency Projects and Immediate Need Reliability Projects going forward.

[3] In holding that LS Power has standing, we need not and do not rely on the supplemental briefing and affidavits.  We caution, however, that an agency's denial of a petitioner's complaint does not alone necessarily suffice to show injury in fact for Article III purposes. *Cf.* Pets. Supp. Br. on Standing at 2-3.  "FERC's rejection of [a petitioner's] challenges in the proceedings before it . . . does not establish constitutional standing."  *Kan. Corp. Comm'n v. FERC*, 881 F.3d 924, 929 (D.C. Cir. 2018).  Finally, because LS Power Midcontinent has standing to raise both claims at issue here, we need not decide whether the other petitioners also have standing. *See N.Y. Republican State Comm. v. SEC*, 927 F.3d 499, 503 (D.C. Cir. 2019) ("If any one of the petitioners has standing to raise a claim, then this court has jurisdiction over that claim without regard to whether any other petitioner also has standing.").

## II. The petitioners' claims are ripe for review.

We readily dispatch FERC's half-hearted ripeness challenge. FERC argues that "the petitions may be dismissed for lack of a ripe controversy because they do not present concrete issues fit for judicial review at this time." Respondent's Br. at 34. In support, FERC notes that MISO "has stated its intent to review cost allocation for" sub-230 kV projects sometime in the future and that MISO "may submit a new proposal." *Id.* (formatting modified and internal citation omitted). It therefore suggests we delay review of these petitions. We reject FERC's argument that the petitions are not yet ripe because MISO plans to eventually revisit the cost allocation for lower voltage projects. "[A]n agency faced with a claim that a party is violating the law . . . cannot resolve the controversy by promising to consider the issue in a prospective legal framework." *City of Miami v. FERC*, 22 F.4th 1039, 1043 (D.C. Cir. 2022). MISO's stated intention to consider new policies at some future time does nothing to resolve LS Power's current claim of injury from the existing voltage threshold.

## MERITS

The petitioners object to two features of the orders at issue: (1) FERC's acceptance of MISO's proposal to lower the Market Efficiency Project threshold to 230 kV and attendant denial of the petitioners' request to lower the threshold further to 100 kV; and (2) FERC's acceptance of the Immediate Need Reliability Exception to the requirement that Market Efficiency Projects be awarded competitively. We reject both challenges.

We review FERC's orders under the deferential arbitrary-and-capricious standard of review. *Old Dominion*, 898 F.3d at 1260. Under that standard, "we uphold FERC decisions if the agency has 'examined the relevant considerations and articulated a satisfactory explanation for its action, including a

rational connection between the facts found and the choice made.'" *Id.* (quoting *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016)). "Because this standard is deferential, we do not require FERC . . . to utilize a particular formula, or to allocate costs with exacting precision." *Id.* (internal citations omitted). "However, we have set aside orders when FERC's allocation of costs was either unreasonable, or inadequately explained." *Id.* (internal citations omitted). FERC's "factual findings are conclusive if supported by substantial evidence." *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 54 (D.C. Cir. 2014).

Recall that two of the orders on review arise from a complaint filed by the petitioners under section 206 of the Federal Power Act, challenging MISO's then-existing tariff. In that posture, the petitioners had the burden of showing that the challenged tariff provisions are "unjust, unreasonable, unduly discriminatory, or preferential." 16 U.S.C. § 824e(b); *see also New England Power Generators Ass'n v. FERC*, 879 F.3d 1192, 1200 (D.C. Cir. 2018). And the other two orders on review arise from MISO's proposed tariff filing under section 205 of the Act. In those proceedings, MISO bore the burden of demonstrating that the proposed tariff revisions are "just and reasonable." 16 U.S.C. § 824d(e); *see also New England Power Generators Ass'n*, 879 F.3d at 1200. In considering whether FERC acted arbitrarily in accepting MISO's filing and rejecting the petitioners' section 206 complaint, we bear these respective burdens in mind.

## I. FERC's decision to accept 230 kV as the Market Efficiency Project threshold was reasonable.

The petitioners challenge both FERC's decision to accept MISO's proposed 230 kV threshold for Market Efficiency Projects in the section 205 proceeding, and FERC's rejection

of the petitioners' section 206 complaint asking for a 100 kV threshold. We uphold both decisions.

## A. FERC reasonably accepted the proposed voltage threshold.

FERC's decision to accept MISO's proposal to lower the threshold from 345 kV to 230 kV was reasonable. The Supreme Court has explained that the "statutory requirement that rates be 'just and reasonable' is obviously incapable of precise judicial definition, and we afford great deference to the Commission in its rate decisions." *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty., Wash.*, 554 U.S. 527, 532 (2008). FERC thus "enjoys broad discretion to invoke its expertise in balancing competing interests and drawing administrative lines." *Am. Gas Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010). "We are generally unwilling to review line-drawing performed by the Commission unless a petitioner can demonstrate that lines drawn are patently unreasonable, having no relationship to the underlying regulatory problem." *ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1085 (D.C. Cir. 2002) (internal citation omitted and formatting modified). And FERC is "free to undertake reform one step at a time" so long as its "gradualism" does not "yield[] unreasonable" results. *S.C. Pub. Serv. Auth.*, 762 F.3d at 88 (internal citation omitted). In light of those standards, it was reasonable for FERC to accept a 230 kV threshold, which increases the overall number of projects subject to regional cost allocation and competition, as the new lower bound for Market Efficiency Projects.

MISO's Director of Economic and Policy Planning, Jesse Moser, explained the decision to move the threshold to 230 kV but not down to 100 kV. Market Efficiency Projects were "developed to provide a regional cost sharing mechanism for

those projects that, through congestion relief, provided widespread economic benefits." Moser Testimony at 30, J.A. 312. "[B]ecause of their capability to move large amounts of energy long distances efficiently," Moser continued, "it is higher voltage projects that provide additional increased capacity that improves regional energy delivery." *Id.* "Lower voltage projects," by contrast, "can provide some economic congestion relief, but the impacts of those projects tend to stay more localized." *Id.* Moreover, "because these benefits are generally smaller and more locally concentrated, they are more volatile and sensitive to assumptions used to forecast . . . savings." *Id.* Importantly, however, "there are projects" at 230 kV and above "that have broader benefits," and MISO therefore brought the threshold down to 230 kV to "address[] the potential mismatch of costs and benefits . . . and increase[] the range of projects that could qualify as Market Efficiency Projects." Moser Testimony at 30-31, J.A. 312-13.

MISO also explained why it had not proposed the threshold that petitioners favor: Namely, "moving to the even *lower* threshold of 100 kV did not," in MISO's view, "provide a distinction between regional economic projects and local projects needed for local needs." Moser Testimony at 31, J.A. 313. Maintaining such a distinction is in line with Order No. 1000. In requiring competitive solicitation for certain projects, FERC in Order No 1000 did not require eliminating rights of first refusal for incumbent providers or developers for all transmission projects. Rather, it so required only for projects whose costs are shared regionally. Order No. 1000, 136 FERC ¶ 61,051, P 7. FERC therefore apparently thought it important to maintain a distinction between projects that generally benefit the entire region and those that are locally beneficial, with cost causation and the economic benefits of competition tipping toward competitive bidding in the former category, but not necessarily in the latter.

We conclude that FERC acted reasonably in accepting 230 kV as a suitable proxy for the well-established regulatory distinction between regional and local projects given that, as a general matter, lower voltage projects "tend to stay more localized" and their benefits are "more locally concentrated." Moser Testimony at 30, J.A. 312. In these proceedings, FERC evaluated MISO's proposal—which, again, lowered the threshold from the 345 kV line FERC had previously approved—and determined that it was just and reasonable. *See Order Accepting Proposal*, 172 FERC ¶ 61,095, PP 46, 50. We accept the Commission's judgment on the point: The threshold balances the benefits of competitive solicitation by expanding the universe of competitive projects, while recognizing that projects responding primarily to local problems need not go through the extra steps of competitive solicitation. FERC is given considerable latitude in drawing those types of lines and, as explained next, none of the petitioners' contrary evidence convinces us that 230 kV is an inappropriate cutoff.

**B. FERC's rejection of the petitioners' contrary complaint was likewise reasonable.**

In addition to urging FERC to reject MISO's 230 kV proposal, petitioners separately asked FERC to hold that 345 kV is unjust and require MISO to lower the threshold to 100 kV. In support of their argument, petitioners point to past sub-230 kV projects they say produced significant regional benefits. They also rely on FERC's statements in prior opinions that petitioners read as deciding that sub-230 kV projects are regionally beneficial. They therefore claim that FERC's failure to lower the voltage threshold to 100 kV violated applicable precedent requiring regional cost sharing for projects with significant regional benefits. FERC reasonably rejected petitioners' evidentiary support for the notion that 100 kV is the required voltage threshold for Market

Efficiency Projects, and it adequately reconciled its position with the relevant precedent.

1. FERC acted within its authority when it held that petitioners' argument to lower the threshold to 100 kV was insufficiently supported by the record. The petitioners here point to evidence before FERC that they say demonstrates that the old 345 kV threshold was unjust and unreasonable and that the 230 kV threshold adopted in the challenged orders suffers the same flaw. They focus in particular on evidence that (1) most congestion on the MISO system occurs on facilities below 230 kV; and (2) some projects between 100 kV and 229 kV benefit zones beyond the one in which a project is physically located. Those contentions do not persuade us that FERC has acted arbitrarily.

"First," as FERC notes, "the mere fact that congestion exists on facilities below 230 kilovolts does not support LS Power's position that the voltage threshold should be lowered to 100 kilovolts." Respondent's Br. at 45. "Congestion in the grid arises when the demand for electricity exceeds the capacity of existing transmission infrastructure." *Int'l Transmission Co. v. FERC*, 988 F.3d 471, 473 (D.C. Cir. 2021). "That results in a grid that cannot accommodate consumer demand in certain areas . . . which ultimately raises costs to consumers." *Id.* As explained above, relieving congestion in the grid is one of the purposes of economic projects.

The existence of some congestion on lower voltage facilities does not alone mean that lower voltage projects must be competitively bid. As MISO explained to FERC, "the voltage level of a constraint is not determinative of the voltage level of the solution." J.A. 909 (MISO Answer); *see also* Joint Br. of Non-Governmental Intervenors for Respondent at 18

("Congestion is a normal occurrence in interconnected transmission systems and the most economical solution to a congested flowgate does not necessarily require a transmission solution of the same voltage class."). In other words, that petitioners have identified congestion on lower voltage facilities does not necessarily mean that the projects used to fix that congestion will be below 230 kV. The petitioners also fail to close the loop by explaining why any solution to sub-230 kV congestion would necessarily have significant regional benefits and should therefore be competitively bid. *See* Joint Br. of Non-Governmental Intervenors for Respondent at 18-19. They therefore fail to "establish the necessary causal link between congestion and regional benefits . . . sufficient to mandate regional cost allocation [for such] lower voltage facilities." *Id.* at 19.

Second, the petitioners' few examples of lower voltage projects with regional benefits did not render FERC's acceptance of a 230 kV threshold unreasonable. The petitioners first point to examples from two MISO stakeholder presentations, one from 2016 and another from 2017, that they claim show that the 230 kV threshold is unreasonable. But, as FERC recognized, those examples were merely hypothetical situations used for stakeholder discussions, not actual, vetted solutions to reliability issues. Hypothetical project examples that "had not undergone thorough engineering review and approval through the Midcontinent planning process" are not compelling enough evidence to convince us to override FERC's determination in this highly technical area. *See* Joint Br. of Non-Governmental Intervenors for Respondent at 20.

Petitioners also point to two 161 kV facilities from MISO's 2018 transmission plan that they say benefited more than one zone in the MISO region so should have been competitively bid but were not because they fell below the

voltage threshold for Market Efficiency Projects. We conclude FERC acted within its authority in dismissing these two examples as "isolated." *Complaint Rehearing Order*, 173 FERC ¶ 61,202, PP 7 n.13, 8. FERC need not "consider cost-allocation rules on a project-by-project basis, which would unravel the framework of *ex ante* tariffs established by Order No. 1000 and approved by this Court." *Long Island Power Auth. v. FERC*, 27 F.4th 705, 715 (D.C. Cir. 2022). "Instead, FERC must ensure only that there is 'some resemblance' between costs and benefits." *Id.* (quoting *Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 13-14 (D.C. Cir. 2021)). FERC reasonably determined that two examples do not sufficiently demonstrate that the entire *ex ante* class of Market Efficiency Projects is improperly cost allocated.

In sum, FERC reasonably held that petitioners' hypotheticals and two isolated examples were insufficient evidence to necessitate rejecting MISO's proposed voltage threshold.

2. FERC also reasonably applied its own relevant precedent and that of this court.

a. Petitioners challenge FERC's orders as inconsistent with our decision in *Old Dominion*, in which we elaborated on the requirements of the cost-causation principle. There, we remanded FERC's decision to accept a tariff amendment proposed by the regional transmission operator PJM Interconnection, LLC, that barred regional cost allocation for certain high-voltage transmission projects. 898 F.3d at 1260, 1264. In that case, the "critical point [wa]s undisputed: high-voltage power lines produce significant regional benefits within the PJM network, yet the amendment categorically prohibit[ed] any cost sharing for high-voltage projects." *Id.* at 1260. "The amendment thus produce[d] a severe misallocation

of the costs of such projects." *Id.* at 1261. For the two high voltage projects at issue, the entities paying all of the costs would enjoy less than half of the benefits, which we held amounted to "a wholesale departure from the cost-causation principle." *Id.*

We rejected FERC's attempt to lump together the high-voltage projects with low-voltage projects for purposes of evaluating the category's compliance with the cost-causation principle, reasoning that because the costs of low-voltage projects had always been allocated locally, the amendment primarily operated to eliminate cost sharing for high-voltage projects "that FERC ha[d] recognized produce *significant* regional benefits." *Id.* at 1261-62 (emphasis in original). We noted that FERC "need not always carve out exceptions for arguably distinct subcategories of projects." *Id.* at 1262. But because "it [wa]s undisputed that high-voltage and low-voltage projects are significantly different with regard to which utilities benefit from them," we required FERC to disaggregate that high-voltage subcategory and allocate those costs regionally. *Id.*

The crux of our holding in *Old Dominion*—that where FERC has found that a category of projects has significant regional benefits, it must permit regional cost-sharing for that category—is in line with FERC's challenged orders. As the Commission explained in one of the orders on review, "[u]nlike the situation in [*Old Dominion*], neither MISO nor the Commission . . . has made the finding that MISO projects between 100 kV and 230 kV produce 'significant regional benefits.'" *Order Accepting Proposal*, 172 FERC ¶ 61,095, P 49 (quoting *Old Dominion*, 898 F.3d at 1257, 1261). Indeed, FERC's decision to distinguish between higher and lower voltage categories in the challenged orders is only bolstered by our decision in *Old Dominion*, which recognized that high-

voltage and low-voltage projects are "significantly different with regard to which utilities benefit from them." 898 F.3d at 1262. FERC's decision to allow the 230 kV threshold is therefore consistent with *Old Dominion*.

b. FERC's orders rejecting MISO's first two proposals did not obligate it to reject MISO's third proposal. The petitioners assert that in rejecting the first two, FERC determined that MISO could calculate the regional beneficiaries of sub-230 kV economic projects, and that because the costs of such projects could be allocated to other benefitting zones, MISO's proposals failing to make any such allocation violated the cost-causation principle. By accepting the third proposal, the petitioners argue that MISO "asked FERC to stick its regulator head in the sand, and FERC agreed to do that." Petitioners' Br. at 46. After FERC twice found that MISO could measure the regional beneficiaries of sub-230 kV projects, petitioners say FERC essentially held here that, as long as MISO did not actually calculate any regional benefits, "it could pretend that no regional benefits existed." *Id.*

The problem with petitioners' argument is that it depends on a factual conclusion that FERC never made in rejecting the two prior proposals: that sub-230 kV projects categorically produce significant regional benefits. To the contrary, as FERC explained, "[t]he June 2019 Order and the March 2020 Order did not confer any finding on whether lower-voltage transmission facilities produced regional benefits." *Proposal Rehearing Order*, 173 FERC ¶ 61,203, P 16.

When FERC rejected MISO's first proposal, it found that the new Local Economic Project category for certain sub-230 kV projects was "inconsistent with the cost causation principle" because of how the proposal defined that category. *2019 Proposal Rejection*, 167 FERC ¶ 61,258, P 56. The

proposed definition, FERC emphasized, would have included only projects with actual regional benefits, because "a project could not qualify as a Local Economic Project if MISO were unable to calculate a region-wide 1.25-to-1 benefit-to-cost ratio." *Id.* P 64. As proposed, then, MISO planned to calculate those regional benefits and then "ignore the results . . . in order to allocate the costs only to the Transmission Pricing Zone(s) where the project is located." *Id.* P 63. FERC rejected that proposal. But it did so on the basis that MISO cannot have a category of projects with identified—indeed, definitional—regional benefits that it ignores for cost-allocation purposes. It did not, however, hold that sub-230 kV projects, as a general matter, have significant regional benefits.

FERC made a similarly limited holding in rejecting MISO's second proposal. This time, MISO eliminated the requirement that Local Economic Projects meet a regional benefit-to-cost ratio, but it still proposed to evaluate such projects using regional benefit metrics and then to ignore those benefits, if any were found, by allocating the costs to only the local zone. *2020 Proposal Rejection*, 170 FERC ¶ 61,241, PP 59-60. FERC again held that MISO could not calculate regional benefits and then disregard those benefits in allocating the costs of projects. *Id.* P 67. But, again, FERC did not hold that such projects actually produce significant regional benefits in any kind of consistent way such that their costs are categorically required to be allocated on a regional basis. At most, it held that it was "likely" that MISO would have to "disregard regional transmission benefits that it will necessarily uncover." *Id.* That sort of conjecture—that if MISO calculated regional benefits for sub-230 kV it might find some—is not the same as FERC finding as a factual matter that sub-230 kV projects produce the kind of "significant" regional benefits that we found problematic in *Old Dominion*—and

certainly not that it so found on such as a scale as to require MISO to further lower the threshold. *See* 898 F.3d at 1260.

To be sure, in rejecting MISO's first two proposals, FERC evidently accepted MISO's assumption that it was at least possible, if not likely, that some sub-230 kV projects could produce regional benefits. But that acceptance alone does not establish that 230 kV is an unreasonable threshold. First, *Old Dominion* concerned a category of projects conceded to have *significant* regional benefits, a phrase that appears in the opinion eleven times. As explained, petitioners' efforts to show incidental regional benefits do not reach that level, nor is significant regional benefit established by FERC having told MISO it could not ignore regional benefits, if it found them, in allocating costs. Second, *Old Dominion* analyzed FERC's justifications for its treatment of categories of projects. *See* 898 F.3d at 1261-63. We have not read Order No. 1000 to require that cost allocation be done on a project-by-project basis. *See Long Island*, 27 F.4th at 715. Petitioners have never suggested that there is a distinct subtype of sub-230 kV projects that produce significant regional benefits that should be cut away from the rest and regionally cost-allocated. *Cf. Old Dominion*, 898 F.3d at 1261-63. It thus had the burden to prove that the entire category was problematic. FERC's prior rejections, which were based on the illogic of MISO's proposed treatment of regional benefits, if and when they arose, does not meet that bar.

We share petitioners' concern that FERC's holding here—that as long as MISO does not attempt to calculate any regional benefits, it may locally allocate the costs of sub-230 kV projects—encourages a head-in-the-sand approach to cost allocation. When read together, the three FERC opinions seem to allow regional transmission organizations to allocate the costs of lower voltage projects only to the local zone despite

possible regional benefits so long as the transmission organization does not calculate those regional benefits. But the question before us is narrow: whether a 230 kV threshold for Market Efficiency Projects is arbitrary and capricious. The record here, including the orders rejecting the first two proposals, does not reflect any determination that sub-230 kV projects in fact produce regional benefits in such a significant, categorical way as to require regional cost allocation. And FERC's holding is limited to lower voltage projects, which again generally have more local benefits. *See Old Dominion*, 898 F.3d at 1261. We accept FERC's explanation that the orders on review comport with the two prior orders.

c. We have little trouble concluding that FERC reasonably distinguished its order in *Northern Indiana Public Service Co.*, 155 FERC ¶ 61,058 (2016), concerning interregional transmission planning between MISO and PJM. In that proceeding, FERC held that MISO's tariff was unjust and unreasonable because its minimum voltage threshold for interregional economic transmission projects excluded certain projects in the MISO-PJM interregional transmission planning process from consideration even though they would "benefit both regions." *Id.* P 129. The Quick Hit Analysis, an effort by MISO and PJM to identify potential interregional economic transmission projects, had found potential projects rated below 345 kV, including down to 138 kV, with "significant economic benefits to both" regions. *Id.* P 131; *see also id.* P 100 n.175. FERC therefore "require[d] MISO to reduce its minimum voltage threshold for a[n] interregional economic transmission project from 345 kV to 100 kV," *id*. P 129, which was PJM's threshold, *id.* P 95. In so holding, FERC explicitly stated that it was "not requiring MISO to change the Market Efficiency Project 345 kV . . . threshold[] for MISO regional transmission projects." *Id.* P 131 n.238.

Petitioners' argument that FERC's holding in *Northern Indiana* mandates a 100 kV threshold for regional, and not just interregional, projects does not hold up. In *Northern Indiana*, FERC was addressing a characteristic of the interregional planning process: "[A]n interregional economic transmission project had to meet *both* MISO's minimum voltage threshold of 345 kV *and* PJM's voltage threshold of 100 kV to be constructed." *Proposal Rehearing Order*, 173 FERC ¶ 61,203, P 14 (emphasis in original). In that context, it made sense for FERC to require MISO to move its threshold down to meet PJM's 100 kV threshold to encourage project development. FERC therefore reasonably viewed *Northern Indiana* as "tied to the specific circumstances involved and the specific findings that the Commission made with regard to the record evidence in that proceeding." *Id.*; *see also Entergy Arkansas, LLC v. FERC*, No. 20-1262, 2022 WL 2760877, at *7 (D.C. Cir. July 15, 2022) (explaining that FERC found significant regional benefits for lower voltage interregional projects, but not for regional projects). On the record in that case, FERC determined that projects down to 100 kV would benefit both PJM and MISO and MISO should therefore lower its bar to match PJM's. That holding did not announce "the general principle that 100 kV is a just and reasonable voltage threshold, but 345 kV is not, in all circumstances." *Id.* "[W]e defer to an agency's reasonable application of its own precedents," so accept FERC's distinction of *Northern Indiana* here. *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277, 1284 (D.C. Cir. 2007).

## II. FERC's approval of MISO's proposed exception from competitive solicitation for Immediate Need Reliability Projects was reasonable.

Petitioners argue that FERC's decision to approve MISO's Immediate Need Reliability Exception should be vacated

because (1) evidence shows that the exception is unlikely to be used in a "limited" way; and (2) MISO's version of the exception is inconsistent with FERC's acceptance of similar exceptions in other regions. Neither argument shows FERC's order to be arbitrary.

As explained, Order No. 1000 disapproved tariff provisions giving incumbent transmission providers a right of first refusal to build transmission facilities selected in a regional transmission plan. *See LSP 2022*, 28 F.4th at 1287. Instead, it requires the region to hold a competitive developer-selection process. *Id.* "But the Commission recognized an exception central to this dispute: if the time needed to solicit and conduct competitive bidding would delay the project and thereby threaten system 'reliability,' then competitive bidding would not be required." *Id.* (quoting Order No. 1000, 136 FERC ¶ 61,051, P 329). Several regional transmissions organizations thus have FERC-approved immediate need reliability exceptions to competitive bidding. *See, e.g.*, *ISO New England Inc.*, 171 FERC ¶ 61,211, PP 1-3 (2020); *PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,212, PP 3, 16 (2020); *Sw. Power Pool, Inc.*, 171 FERC ¶ 61,213, PP 3, 47 (2020); *ISO New England Inc.*, 172 FERC ¶ 61,293, PP 22-32 (2020).

As noted above, in approving those exceptions, FERC has applied five requirements for transmission organizations to meet when using the exception: (1) the project is needed in three years or less to fix a reliability problem; (2) the transmission organization "must separately identify and then post an explanation of the reliability violations and system conditions in advance for which there is a time-sensitive need, with sufficient detail of the need and time-sensitivity"; (3) the transmission organization must give stakeholders a written description of the decision to designate an incumbent transmission owner and the circumstances surrounding the

immediate reliability need; (4) "[s]takeholders must be permitted time to provide comments in response to the project description," which must be made public; and (5) the transmission organization must maintain and post a list of prior year designations of immediate-need projects. *ISO New England Inc.*, 171 FERC ¶ 61,211, P 3.

Petitioners' first argument—that the exception will not be sufficiently limited—does not succeed. Although we are concerned that the number of exempted reliability projects might surpass those open to competition, we owe considerable deference to FERC's expertise in setting the appropriate balance between the benefits of competition and the need to address pressing reliability problems in the power grid. *LSP 2022*, 28 F.4th at 1291. And FERC reasonably rejected the petitioners' evidence for its contention that the exception would be overused. Recall that MISO's proposed exception does not cover mere Baseline Reliability Projects and is instead limited to those that also qualify as Market Efficiency Projects. In this case, the petitioners' claim rests on the fact that "85% of Baseline Reliability Projects approved by MISO were needed in 36 months or less," which they say makes it "likely" that most Baseline Reliability Projects that also qualify as Market Efficiency Projects will probably be needed within three years and thus be exempted from competitive bidding. Petitioners' Br. at 53. FERC considered the statistic and reasonably called it "inflated" because of the mismatch between the data and the category of projects at issue. *Proposal Rehearing Order*, 173 FERC ¶ 61,203, P 21; *see also* Petitioners' Reply Br. at 29 (conceding that "the number of combined projects may not be known").[4]

---

[4] Contrary to petitioners' suggestion, FERC did not depart from its 2013 precedent in *ISO New England, Order on Compliance Filings*, 143 FERC ¶ 61,150, PP 237-38 (2013), in which FERC prevented

Second, the petitioners' argument that the exception departs from similar proposals in other regions because those entities are required to post their explanation of need *before* designating the incumbent owner as the developer fares no better. The petitioners emphasize that MISO's proposal lets it provide an explanation of need only after designating an incumbent developer. And they claim that when FERC approved MISO's *post hoc* disclosure proposal, it ignored the wording and intent behind the criteria for immediate-need exceptions it had previously mandated, thereby depriving objectors of any opportunity to dispute whether the project qualifies for the exemption until after the incumbent has already begun the project, confounding the purpose of the notice.

We conclude FERC adequately justified its decision regarding the timing of the requisite notice. FERC determined that its precedents adopting criteria for the use of the immediate need exception do not necessarily require MISO to post before designating the incumbent. As FERC explained, any concern regarding the timing of MISO's notice is adequately ameliorated by the fact that stakeholders have ample opportunity to provide input during the Baseline Reliability Study and transmission planning process, which happens before a project is designated an exempted project. And that opportunity is supplemented by the sixty-day comment period that follows the notice that an exempted project has been approved. FERC acted within its discretion when it held that the concern motivating its notice requirement in its prior cases is "sufficient time for stakeholder input," and that the mechanisms MISO has in place to receive that input suffice to

---

ISO New England from exempting projects needed within five years, instead requiring a three-year limit. 143 FERC ¶ 61,150, PP 237-38. The three-year period it applied here to MISO's proposal is the same requirement it applied there.

accomplish that goal. *Proposal Rehearing Order*, 173 FERC ¶ 61,203, P 23. Again, FERC's "interpretation of the parameters set by [its] own orders" and its "judgment involving regulatory policy at the core of [its] mission," are "entitled to substantial deference. *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 533 (D.C. Cir. 2010).

## CONCLUSION

For the foregoing reasons, we deny the petitions for review.

*So ordered*.

ROGERS, *Circuit Judge*, dissenting in part and concurring in part. LSP petitions for review of FERC orders in two cases, contending that it has been denied the opportunity to bid on transmission projects. A threshold issue was whether LSP demonstrated that it has standing under Article III of the Constitution to bring these challenges. At oral argument in both cases LSP's experienced counsel asserted that standing was self-evident, but candidly acknowledged in response to questions[1] that LSP's filings did not include specific evidence of its injury-in-fact, as required to establish standing.[2] Because detailed averments in LSP's supplemental affidavits filed in response to the court's order, *see* Am. Orders, No. 20-1421 & No. 20-1465 (Feb. 28, 2022) (Rogers, J., not joining), suffice to demonstrate standing, I concur in holding LSP has standing and in rejecting LSP's merits challenges to FERC's orders.

**I.**

To establish standing under Article III, a party "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 612 (D.C. Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016)). "The party invoking the federal courts' jurisdiction bears the burden of establishing each of those elements." *Util. Workers Union of Am. Local 464 v. FERC*, 896 F.3d 573, 577 (D.C. Cir. 2018) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Where, as here, the petitions challenge FERC's orders directly, the petitioner's "burden of production" is "the same as that of a plaintiff moving for summary judgment in the district court: it must support each element of standing 'by affidavit or other evidence,' including whatever evidence the administrative

---

[1] *See OA Tr. No. 20-1421*, at 14; *OA Tr. No. 20-1465*, at 11-12.
[2] *See OA Tr. No. 20-1421*, at 14; *OA Tr. No. 20-1465*, at 11-12, 21-23.

record may already contain." *Id.* (quoting *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002)). More is "requir[ed]" than "representations of counsel" in briefs, *Sierra Club*, 292 F.3d at 901, or a party's "bare assertions," *Util. Workers Union*, 896 F.3d at 578. Standing may be self-evident "if the complainant is 'an object of the action (or foregone action) at issue.'" *Sierra Club*, 292 F.3d at 900 (quoting *Lujan*, 504 U.S. at 561-62). But when, as here, "a petitioner is not directly regulated by the challenged [order]," *Am. Fuel & Petro. Mfrs. v. EPA*, 3 F.4th 373, 379 (D.C. Cir. 2021), standing is "ordinarily 'substantially more difficult' to establish," *Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff*, 23 F.4th 1028, 1032 (D.C. Cir. 2022) (quoting *Lujan*, 505 U.S. at 562). More specifically, if standing is not "self-evident," then there must either be evidence in the administrative record of the requisite injury or petitioners must file sworn affidavits with the opening briefs "substantiat[ing]" these injuries. *Sierra Club*, 292 F.3d at 900; *see* D.C. Circuit Rule 28(a)(7) (incorporating *Sierra Club*, 292 F.3d at 900-01).

It is well settled that the petitioner invoking this court's jurisdiction has the burden to provide evidence that it suffers an injury "that is both 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical,'" *New England Power Generators Ass'n, Inc. v. FERC*, 707 F.3d 364, 368 (D.C. Cir. 2013) (quoting *Lujan* 504 U.S. at 560-61), because the injury "has either transpired or is 'imminent.'" *No Gas Pipeline v. FERC*, 756 F.3d 764, 767 (D.C. Cir. 2014) (citing *Occidental Permian Ltd. v. FERC*, 673 F.3d 1024, 1026 (D.C. Cir. 2012)). The imminence requirement "ensure[s] that the alleged injury is not too speculative for Article III purposes," *Union of Concerned Scientists v. Dep't of Energy*, 998 F.3d 926, 929 (D.C. Cir. 2021) (quoting *Clapper*, 568 U.S. at 409), so assertions of incurring harm "some day," *Kans. Corp. Comm'n v. FERC*, 881 F.3d 924, 930 (D.C. Cir. 2018) (quoting

*Lujan*, 504 U.S. at 564), or dependent upon an "attenuated chain" of interim steps, *id.* (quoting *Clapper*, 568 U.S. at 410), are insufficient. Rather, the petitioner must "show a 'substantial probability' that all of these steps will occur and, if so, when." *Id.* (quoting *Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 63 (D.C. Cir. 2000)).

Neither the Supreme Court nor this court has held that a bare assertion that a petitioner is "ready, willing, and able" to compete is sufficient to establish Article III injury-in-fact. *Contra* No. 20-1421, slip op. at 16; No. 20-1465, slip op. at 14. Nor was this argument advanced by LSP in its opening briefs. *Cf. Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005). As the court recently reiterated, "general averments, conclusory allegations, and speculative some day intentions are inadequate to demonstrate injury in fact." *Finnbin, LLC v. Consumer Prod. Safety Comm'n*, No. 21-1180 (Aug. 2, 2022) (slip op. at 13) (quoting *Worth v. Jackson*, 451 F.3d 854, 858 (D.C. Cir. 2006)). Thus, in *LSP Transmission Holdings, LLC v. FERC* ("*LSP I*"), 700 F. App'x 1 (D.C. Cir. 2017), the court found no standing where petitioners "identified no specific project" for which they were prevented from competing. *Id.* at *2. By contrast, in *LSP Transmission Holdings II, LLC v. FERC* ("*LSP II*"), 28 F.4th 1285 (D.C. Cir. 2022), the court held petitioners had standing when they "identified" "thirty [] projects" for which they were "denied the ability to bid." *Id.* at 1289.

**II.**

Although this court has identified limited circumstances where it may exercise its discretion to request that parties submit supplemental affidavits to establish their standing, those circumstances did not exist in the instant cases. For example, "if the parties reasonably, but mistakenly, believed

that the initial filings before the court had sufficiently demonstrated standing, the court may . . . request supplemental affidavits and briefing to determine whether the parties have met the requirements for standing." *Ams. For Safe Access v. DEA*, 706 F.3d 438 (D.C. Cir. 2013) (citing *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1296–97 (D.C. Cir. 2007)). And although LSP's counsel in both cases acknowledged the insufficiency of their initial filings, they never requested that the court allow them to provide supplemental affidavits, as had occurred in *American Library Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005). *See Cmtys. Against Runway Expansion, Inc. v. FAA*, 335 F.3d 678, 684 (D.C. Cir. 2004). Indeed it appears that LSP's reluctance, in the absence of a court order to supplement the record here may stem from interim action by the Commission to afford petitioners like LSP the relief they sought, namely for the Commission to reconsider its requirements for approving transmission development plans. *See* Advance Notice of Proposed Rulemaking (July 15, 2021) ("2021 ANPR"), RM21-17-000, where there is a broad and comprehensive inquiry into the effects of its Orders on transmission planning and development, *see* 2021 ANPR, at 26, where LSP has submitted lengthy comments; No. 20-1421, Pet'rs' Br. at 21-25; No. 20-1465, Pet'rs' Br. at 26-30.

Consequently, upon expanding circumstances for supplemental filings, the court ordered LSP to file supplemental submissions "to explain and substantiate their claim of standing." *See* Am. Orders, at 1 (Feb. 28, 2022) (Rogers, J., not joining). [3] In the two cases now before the

---

[3] LSP's supplemental briefs in combination with its counsels' statements at oral argument suggest that petitioners "reasonably, but mistakenly, believed" that their initial filings were adequate to demonstrate Article III Standing. *See* Am. Orders, at 1-2 (Feb. 28, 2022) (Rogers, J., not joining); *OA Tr. No. 20-1421*, at 6, 13, 22-23,

court, LSP's initial submissions were insufficient to establish standing because they "failed to identify a 'specific project'" for which petitioners were prevented from competing. *LSP II,* 28 F.4th at 1289 (quoting *LSP I,* 700 F. App'x at *2). Being "ready, willing, and able" is not the standard under relevant precedent. This was clear at oral argument when LSP's counsel could not identify evidence of its standing in either case. In No. 20-1421, the court inquired where it could find evidence that LSP "would have bid on" specific projects that were "erroneously" categorized. *OA Tr. No. 20-1421*, at 14.[4] Counsel responded citing pages in the record that do not identify such projects. *Id.* And when the court asked counsel where the record stated that LSP "competes on all projects," he did not point the court to the information it requested. *Id.* at 14. Likewise in No. 20-1465, counsel for LSP did not cite record evidence when asked to identify specific projects for which his client would compete, *OA Tr. No. 20-1465*, at 11-12, and did not assist the court when he was later prompted to "help" it find standing. *Id.* at 21-23.

In both cases, however, LSP's supplemented records rectify the deficiencies of its initial filings. In No. 20-1421,

---

71; Supp. Br. Standing, No. 20-1421, at 3, 7, 9 (Mar. 9, 2022); *OA Tr. No. 20-1465*, at 11, 20; Supp. Br. Standing, No. 20-1465, at 3-4, 6, 8 (Mar. 9, 2022).

[4]Judge Pillard asked counsel "But where can I find a statement such as a manager declaration or, you know, CEO declaration, saying, we would have bid on these, these ones that are, that are erroneously treated as local rather than regional?" *OA Tr. No. 20-1421*, at 14. Judge Rogers asked counsel where in the record it stated that his client "competes on all projects." *Id.* at 14. Judge Pillard also asked counsel "Where did you identify that those were projects that your clients would bid on?" *OA Tr. No. 20-1465*, at 11-12.

LSP's President Paul Thessen avers that LSP would have competed on twelve specific projects identified in the complaint had the projects been subjected to competition: "I can state with confidence that had MISO conducted a competitive solicitation process for Baseline Reliability Projects providing regional benefits, such as the 12 projects referenced in the complaint, LS Power Midcontinent would have submitted proposals and constructed any awarded projects when and where permitted to do so." Thessen Aff., No. 20-1421, at 8 (Mar. 9, 2022). Additionally, Thessen averred that LSP would have competed for 113 projects approved by MISO in 2019 if competition had been available, and that LSP "would have competed on 2020 and 2021 projects when and where permitted had any been subject to competition." *Id.* at 4. In No. 20-1465, Thessen's affidavit avers "unequivocally yes," that LSP's affiliates "would . . . submit proposals if regionally beneficial economic projects between 100 kV and 229 kV or Market Efficiency Projects that are coupled with a Baseline Reliability Project were available for competition." Thessen Aff., No. 20-1465, at 10 (Mar. 9, 2022).

Further, Thessen points to projects at pages 11-13 of LSP's Complaint as ones that have been excluded from competition due to their classification by the Midcontinent System Operator, Inc. ("MISO") in the "Other Project Category." *Id.* at 9. Thessen avers "with confidence that had MISO conducted a competitive solicitation process for some or all the economic projects that are the subject of the Complaint," LSP's affiliates "would have submitted proposals and constructed any awarded projects when and where permitted to do so." *Id.* at 11.

Thessen's affidavits thereby suffice under the relevant precedent to establish LSP's Article III standing by identifying specific projects for which LSP would compete, *see LSP II*, 28

F.4th at 1289 (citing *LSP I*, 700 F. App'x at 2), such that it is actually or imminently harmed by the challenged orders, *see Clapper*, 568 U.S. at 409-10. In both cases, therefore, Thessen's declarations establish an imminent harm as a result of the challenged orders by "distinguish[ing]" LSP from "any other party who might someday wish to build" a facility. *N.Y. Reg'l Interconnect, Inc. v. FERC*, 634 F.3d 581, 587-88 (D.C. Cir. 2011).

**III.**

In view of the supplemented record establishing LSP's Article III standing under binding precedent, I reach the merits of the challenges to FERC's orders. For the reasons stated by the court in No. 20-1421, slip op. at 19-34 and No. 20-1465, slip op. at 17-34, I conclude that the petitions for review lack merit because FERC's decisions were not arbitrary and capricious. Rather, while acknowledging flaws in some of LSP's arguments on appeal, the court concluded that the Commission provided reasoned explanations for denying LSP's petitions for review. For instance, noting the strength of LSP's new evidence to show spillover of Baseline Reliability Project benefits to zones other than the local zone under the location cost-based allocation approach, it was a sufficiently small subset of projects (twelve out of 400) that the Commission, in light of its experience and expertise and responses to LSP's arguments, could reasonably conclude that setting aside the cost-allocation method for all the projects was not required. *See* No. 20-1421, slip op. Part II.B, at 20.

Accordingly, I dissent in part and concur in part.